**UNITED STATES of America**

**v.**

**Jack MARTIN, Julius Kantor and Harry Appelbaum, Defendants.**

United States District Court
S. D. New York.
Aug. 13, 1959.

Arthur H. Christy, U. S. Atty., New York City, John T. Moran, Asst. U. S. Atty., New York City, of counsel, for United States.

Julius A. Hellenbrand, Kew Gardens, N. Y., John J. Curran and Carl W. Sarett, Kew Gardens, N. Y., of counsel, for defendants, Julius Kantor and Harry Appelbaum.

FREDERICK van PELT BRYAN, District Judge.

Defendants Kantor and Appelbaum apply, pursuant to Rule 41(e), F.R.Crim.P., 18 U.S.C., to suppress evidence consisting of furs, packages of furs and the wrapper from a mailed package seized at the loft premises of Kantor and Appelbaum, Inc., at 305 Seventh Avenue, New York City, on September 6, 1958.[1] Kantor and Appelbaum, Inc., is a manufacturing furrier. Kantor is president, and Appelbaum is secretary-treasurer of the corporation, and, as individuals, they are co-lessees of the premises.

The testimony at the hearing held on this application[2] is in sharp conflict in a number of respects, and particularly on the key issue of whether there was consent to the search. It is not disputed that if there was such consent the other questions raised are academic. To resolve this issue it is necessary only to discuss the events which transpired at the time of the allegedly unlawful search, together with some necessary background.

Some time prior to September 5 one Jack Martin, named as a co-defendant in the indictment, a postal employee assigned to a special delivery package route, was suspected of misappropriating packages entrusted to him for delivery. Martin was placed under surveillance and furs in certain packages he was to deliver were marked by postal inspectors for later identification. Martin was observed on two occasions prior to Sep-

---

1. These defendants are charged in five counts of a ten count indictment with having stolen mail in their possession in violation of 18 U.S.C. § 1708.

2. See my prior memorandum decision on the application dated January 22, 1959, 176 F.Supp. 409.

tember 6, the date of the search (August 23 and 30, 1958), entering 305 Seventh Avenue with packages. This building was not on his assigned route. On August 30 Martin was observed outside of 305 Seventh Avenue conversing with two men, later identified as Kantor and Appelbaum. As a result Martin was given specially prepared and marked packages for delivery on September 6, 1958, and close watch was kept on his activities that morning. Martin was observed by detectives and postal inspectors parking his mail truck near the freight entrance of 305 Seventh Avenue at about 11:20 a.m. He entered the building, stayed there for about ten or fifteen minutes and then came out and joined Kantor in a nearby restaurant at about 11:40. About ten minutes later both men left and separately entered 305 Seventh Avenue.

Approximately fifteen minutes later several postal inspectors and New York City detectives entered the building and proceeded to the loft on the sixth floor occupied by Kantor and Appelbaum. Some time between 12 noon and 12:15 p.m. the search complained of commenced. There is conflict as to what transpired when the premises were entered.

The entrance to the sixth floor loft occupied by Kantor and Appelbaum was through a door leading into a small anteroom with a grilled window on the right opening on a small office. When this door opened a bell rang in the main portion of the premises. There were swinging doors at the far end of the anteroom.[3] Beyond them was a showroom where goods were displayed to customers. To the left on entering the show-

room was a door into a large factory room where furs were cut and garments fabricated. There was a large vault in the factory in which furs were stored. A door, customarily kept locked, led directly from the factory to the outside hallway so that one could leave the factory without passing through the showroom and anteroom. The factory portion of the premises contained miscellaneous paraphernalia including four sewing machines and three cutting tables.

At noon on September 6, 1958, Kantor and Appelbaum were open for business. Kantor was in the showroom with a prospective customer and her two companions discussing the remodelling of a fur coat. In the factory Appelbaum and two employees were working on garments and there was also the defendant Martin. Thus, there were eight people on the premises, three of whom were in Kantor's company in the showroom when the bell rang indicating that someone had come into the anteroom.

Kantor testified that he then opened the door between the showroom and anteroom and " * * * a couple—some officers, [at a later point Kantor's estimate expanded to five or seven] pushed in, they shoved in, and I asked them what they wanted there. So they asked me right away, 'Where are the boxes?' " "So I asked them, 'What kind of boxes?' What are you looking for?" "So he says, 'Never mind.' " "And the men started running into the factory. * * * "

Kantor claimed that he asked if the officers had warrants and was told "We don't need any", that consent to search was neither requested nor given and that one of the officers dragged him into the factory.[4] According to Kantor, taken as

---

3. There is some doubt as to whether these swinging doors were locked prior to the entry of the first of the postal officers. They could be locked, and, if they were, one who sought entry from the anteroom would have to wait until they were unlocked in response to the bell which rang when the outside doors were opened. However, in the view that I take of the

case, it is unnecessary to determine whether or not these doors were locked immediately prior to the arrival of the officers.

4. Kantor also said that he was "smacked" in the stomach by a police officer whom he eventually identified as Detective Reilly after he was "dragged" into the factory.

a whole, the moment he answered the bell seven officers crowded into the showroom, specified in order of entry as Detective Reilly, Postal Inspector Hickey, Detective Kelly, Postal Inspector Cerra, Postal Investigative Aid Washington (wearing a postal uniform), Detective Shannon and Postal Inspector Shea. If this is true there would be grave doubt as to whether under such circumstances, after a "mass invasion" of determined men, any consent given to the search could have been voluntary. However, I am satisfied that Kantor deliberately distorted the facts to create such an impression and that his testimony is not in accord with what actually transpired.

There was no real corroboration of Kantor's story. His co-defendant Appelbaum and the two employees present in the factory at the time of the search testified they did not see and could not overhear his discussion with Hickey. They said that almost immediately after the bell rang some officers entered the factory area and the search began and that many men "ran in". However, at least one, and probably both employees continued to work throughout. Appelbaum denied that he gave any consent to the search.

The testimony of Appelbaum and the two employees as to what occurred is as incredible as that of Kantor. All of them appeared to slant the facts so as to give the picture of a police raid en masse which brushed aside the defendants and all objections to the search. This picture is not substantiated by the credible evidence. The testimony of the two employees that they continued to work is, however, quite consistent with the testimony adduced by the Government.

Inspector Hickey testified in detail as to the circumstances of the search. He said that Investigative Aid Washington (who also testified) first went into the premises dressed in a postal uniform.

Washington told Kantor that he had a package for delivery. He was followed in a moment or two by Hickey and Detective Kelly. Hickey identified himself as a Postal Inspector and explained his mission to Kantor. He told Kantor he was there to recover packages brought into the premises by Martin. After Kantor denied that he knew anything about them Hickey requested permission to look around and Kantor granted such permission.

As Hickey stepped toward the factory Appelbaum came forward. He requested Appelbaum for permission to search the premises and Appelbaum likewise consented.

Up to this point there were only three investigating officers on the premises, all in the showroom. Also present were the prospective customer and her two friends. Kantor was not faced by an entry by storm or an implied threat by numbers but by three officers who asked consent to search in the presence of three disinterested spectators. Only after consent to search was given by both Kantor and Appelbaum, and he had gone into the factory, did Hickey send for two other officers who had been detailed to guard the rear door.[5] The three other officers were not then on the sixth floor and only arrived some fifteen minutes later.

Hickey's testimony is entirely credible and is corroborated in substance by that of four other witnesses. I accept it. Only Hickey's testimony is consistent with the fact that work continued during the search for the packages and with the testimony of the other officers as to where they were at the various relevant times.

After consent to search was obtained Reilly, one of the two officers who was guarding the rear door, entered the premises in response to Hickey's summons and found the three mailed packages which had been in Martin's possession

5. Hickey sent for these officers only when he was able to observe the rear door from inside the factory and thus a guard over it was no longer necessary.

under a desk in the small office partitioned off from the showroom. In the meantime Washington was examining waste paper baskets and had set up an ultra-violet lamp. After about five or ten minutes Washington found a crumpled wrapping of a package which had been entrusted to Martin for delivery on a prior occasion.

Postal Inspector Cerra entered the premises, about ten minutes after the three packages were found, in the company of Detective Shannon. He testified, and I find, that he asked Appelbaum for permission to look in the vault. Appelbaum consented and went into the vault with him. Furs in the vault were then examined under ultra-violet rays. Two pieces were identified by this means, and also by other markings, as furs which Martin had failed to deliver.

Kantor and Appelbaum were not arrested until the conclusion of these events though statements had been taken from those on the premises.

■ Kantor and Appelbaum, as lessees in possession and engaged in running a business on the premises searched, plainly have standing to make application for the suppression of evidence allegedly the fruits of an illegal search. United States v. Pepe, 2 Cir., 247 F.2d 838, 841; Giacona v. United States, 5 Cir., 257 F.2d 450.

■ It is likewise well settled that places of business as well as homes are within the protection of the Fourth Amendment. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Giacona v. United States, supra. However, there are important differences between the search of a home and of a public or semi-public business premises. The search of business premises during business hours, in the presence of disinterested spectators, does not carry with it many of the implications that would be drawn from the search of a private dwelling during the night. Cf. Catalanotte v. United States, 6 Cir., 208 F.2d 264; Judd v. United States, 89 U.S. App.D.C. 64, 190 F.2d 649. This is not to say that the rights protected by the Fourth Amendment are attenuated where a search is conducted in a place of business but merely that inferences of implied coercion cannot be so easily drawn.

There is no doubt that defendants consented to the search. The issue here is whether their consent was sufficient in law to effect a waiver of their rights under the Fourth Amendment.

■■ Probable cause to believe that contraband is on the premises does not justify circumvention of the requirements of Rule 41, F.R.Crim.P., implementing the Fourth Amendment, which requires determination by an impartial magistrate that the circumstances justify the issuance of a search warrant. Jones v. United States, 357 U.S. 493, 497–498, 78 S.Ct. 1253, 2 L.Ed.2d 1514. There is no doubt here that the facts known to the postal inspectors on September 6, 1958, were sufficient to enable them to have procured a search warrant.[6]

■ However, there need be no search warrant if there is consent to the search and that is the sole question here.

■ Consent to a search may constitute a waiver of the rights secured by the Fourth Amendment. See United States v. Dornblut, 2 Cir., 261 F.2d 949; United States v. Gross, D.C.S.D.N.Y., 137 F.Supp. 244; United States v. Reckis, D.C.D.Mass., 119 F.Supp. 687. Cf. United States v. Sclafani, 2 Cir., 1959, 265 F.2d. 408. However, in order for

---

6. Unless justifiable on other grounds, therefore, the search without a warrant was not "reasonable" within the meaning of the Fourth Amendment. See United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L. Ed. 436; Jones v. United States, supra; United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210. Cf. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

consent to constitute a waiver the burden is on the United States to show by clear and convincing evidence that it is unequivocal and specific and freely and intelligently given. United States v. Reckis, supra; United States v. Wallace, D.C.D.C., 160 F.Supp. 859. It must be affirmatively shown that there was no duress or coercion, actual or implied. " 'Invitations' to enter one's house, extended to armed officers of the law who demand entrance are usually to be considered as invitations secured by force." Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651; United States v. Gross, supra; United States v. Minor, D.C.E.D.Okl., 117 F.Supp. 697.

 Mindful of this, and that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights" (Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461) I have no doubt that the search of the defendants' premises on September 6, 1958, was voluntarily consented to by both Kantor and Appelbaum. This is not a case where armed officers demanded entrance. No picture of overwhelming force confronted the defendants. At all times Kantor and Appelbaum were in the presence of fully disinterested spectators, either customers or employees. Cf. United States v. McCunn, D.C.S.D.N.Y., 40 F.2d 295. On the stand both Kantor and Appelbaum revealed themselves to be intelligent, articulate witnesses and sophisticated businessmen of many years' experience in the business world. Neither of them was likely to be overcome with fear or terror under the facts as I have found them to be. Cf. United States v. Gross, supra; United States v. Ong Goon Sing, D.C.S.D.N.Y., 149 F.Supp. 267.

Kantor and Appelbaum were requested to give and gave their consent to the search on three separate occasions. Hickey requested first of Kantor and then of Appelbaum consent to search for the packages brought on to the premises by Martin. Some fifteen minutes later, when Inspector Cerra arrived, he asked for permission to search the vault. This was given by Appelbaum and he voluntarily accompanied Cerra and Washington on the inspection of the vault. The furs in the vault were inspected with the ultra-violet apparatus, and two fur pieces were identified as stolen from the mails.[7]

The consent given by the petitioners was specific and precise and the search was kept within the "bounds of the actual consent". Honig v. United States, 8 Cir., 208 F.2d 916, 917.

This case bears little resemblance to the cases relied on by the petitioners to support their contention that their consent to the search was not freely and voluntarily given. This was no "midnight raid" on a private dwelling by officers carrying drawn guns. See Catalanotte v. United States, supra; United States v. McCunn, supra; United States v. Baldocci, D.C.S.D.Cal., 42 F.2d 567. Nor were any of the petitioners placed under arrest before their consent was requested. Cf. United States v. Reckis, supra.

There are no objective circumstances which point to any coercion, express or implied. On the contrary it is apparent that after the packages were found the search virtually halted until Inspector Cerra came on the scene and requested Appelbaum's permission to enter the vault. Until this was done the ultra-violet apparatus was not even set up.

 The petitioners urge that the initial entry into the premises by Washington was by trick and that a consent to search subsequently given was ineffectual. Their reliance, however, on cases like Gibson v. United States, 80 U.S. App.D.C. 81, 149 F.2d 381, is misplaced. The rationale of these cases is that when

---

7. Appelbaum thereupon voluntarily produced two more fur pieces from the vault with the comment " * * * These were stolen too." Later another coat was identified by initials which had been placed on it for later identification before it was mailed.

268

the search is conducted under a pretense that the searchers are rightfully on the premises, or when the searchers enter by stealth so that the occupant is unaware of the search, "consent is mere acquiescence obtained by fraud" and is meaningless. See, e.g., United States v. Reckis, supra. But here, although there were some elements of deception in Washington's initial entry, there was no *search until* the purpose of the visit was disclosed. It is clear that no advantage was gained by the searchers through the means of entry which they utilized, assuming they could not have walked into these premises without having Washington precede them. Cf. Gibson v. United States, supra. In fact, it was a matter of seconds between Washington's entry and Inspector Hickey's statement of the purpose of the visit and the voluntary consent which followed.

I find the testimony of Inspectors Hickey and Cerra, Washington, Detectives Reilly and Shea, and the other witnesses called by the Government, entirely believable. They testified forthrightly and stood up well under cross-examination. Their testimony is consistent with the physical facts and circumstances. I do not find the testimony of Kantor, Appelbaum and their two employees credible in so far as it conflicts with the testimony of the Government's witnesses and the objective circumstances.

It was for Kantor and Appelbaum to protect their interests as they saw fit. Because their decision to consent to the search in retrospect seems unwise it is too late for them to decide now that they did not give consent because they are unhappy about what was uncovered as a result of the search. Whatever their thoughts at the time they gave consent, their consent was not procured by fear, fraud or duress. The defendants may well have been under the misapprehension that nothing damaging to them could or would be discovered as a result of the search. But this is not sufficient to relieve them of consent freely given.

This circuit holds that the question of whether consent to a search is voluntary is one of fact. The knowledge of the defendant as to whether contraband will be found as the result of the search is only evidence on the question of whether there was in fact voluntary consent. United States v. Dornblut, supra. See, also, United States v. MacLeod, 7 Cir., 207 F.2d 853; but cf. Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819, 820. In any event, however, this case is distinguishable from Higgins were that case followed in this circuit. There the defendant in possession of narcotics almost literally confessed his guilt when he consented to the search. Here the furs involved were well concealed among many legally possessed. Martin was still on the premises and it could have been the hope that his presence would explain the presence of the still unbroken mailed packages. Here, unlike Higgins, a "sane man who denies his guilt" could well have consented to the search.

The motion to suppress is in all respects denied.

So ordered.