STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. DENNIS GEORGE KING, DEFENDANT-RESPONDENT.

Argued February 16, 1965—Decided April 12, 1965.

*Mr. Solomon Forman,* Assistant Prosecutor, argued the cause for appellant (*Mr. Augustine A. Repetto,* Atlantic County Prosecutor, attorney; *Mr. Ernest M. Curtis,* of counsel and on the brief).

*Mr. Gerald Weinstein* argued the cause for respondent.

The opinion of the court was delivered by

PROCTOR, J. A jury found the defendant guilty of robbery (*N. J. S.* 2A:141-1) while armed (*N. J. S.* 2A:151-5). On his appeal to the Appellate Division, the conviction was reversed on the ground that certain evidence introduced against him at his trial had been obtained by an unconstitutional search and seizure since his consent to the search had not been voluntarily given. *State v. King,* 84 *N. J. Super.* 297 (1964). This court granted the State's petition for certification. 43 *N. J.* 266 (1964).

At about 6:00 P. M. on January 15, 1962, Mrs. Helen Clancy, who had been helping Mrs. Jean Ireland in the latter's dress shop in Atlantic City, left for home. She noticed a man wearing a trench coat and cap standing in the doorway next to the shop. A short time later as Mrs. Ireland, in leaving for the night, stooped to unlock the front door of the shop to let herself out, a man wearing a trench coat and cap pushed his way into the store, knocking her down. He pointed a gun at her and attempted to force her to the unlighted rear of the store. After struggling with him, she broke away and ran out to the sidewalk, where she fell. He followed and pulled her pocketbook from her arm. As he fled down the street, gun in hand, he went by a passerby, Miss Pearl Hamm. Mrs. Ireland's pocketbook contained $1,020, the shop's receipts for the week.

About 1:30 in the morning of January 17, 1962, the defendant was arrested at 205 Rosemont Place in Atlantic City,

the apartment of Mrs. Alice Ford with whom he was living. The apartment was searched by the two arresting officers, who found a trench coat, a cap, and a gun.

At the trial, Mrs. Ireland, Mrs. Clancy, and Miss Hamm all identified the defendant as the perpetrator of the robbery. Mrs. Ireland and Miss Hamm both identified the trench coat, cap, and gun obtained from the apartment where the defendant was arrested as similar to those used by the robber.

Prior to the trial, the defendant made a motion to suppress the gun, the cap, and the coat as fruits of an illegal search and seizure. Pursuant to *R. R.* 3:2A–6, a preliminary hearing was held before the trial judge. The defendant and Mrs. Ford testified in support of the motion. The two police officers who had arrested the defendant and searched the apartment, Patrolman William Shepperson and his uncle, Detective Robert Shepperson, testified on behalf of the State.

The defendant testified that early in the evening of January 16, while in a cocktail lounge near his home, he had a conversation with Patrolman Shepperson. A man came in and remarked that the newspaper contained a description of the dress shop robber which fitted the defendant. Then Patrolman Shepperson turned to the defendant and said, "Yes, Dennis you fit the description. Let me see your hand." The defendant showed the patrolman his hand but nothing more was said. After stopping at another place the defendant returned to his apartment at about 12:30 A. M. on the morning of January 17. About an hour later, Patrolman Shepperson rang the doorbell and told him that the police wanted to ask him questions at City Hall. He accompanied the patrolman to an automobile outside. Detective Shepperson was sitting in the front seat, and the defendant got into the back seat. Patrolman Shepperson got into the driver's seat. As the car headed towards City Hall, Detective Shepperson accused the defendant of committing the robbery. He asked him where the money and pocketbook were and said that if he did not tell him, they would return and search the apartment. The defendant replied, "I can't tell you where the money is," and

denied committing the robbery. Patrolman Shepperson turned the car around. Nothing was said while they drove back to the apartment. The defendant used his own key to let the police officers into the apartment and called to Mrs. Ford, who was in the bedroom. The defendant said that the police officers never asked his permission to search the apartment, nor did they ask Mrs. Ford's permission. He said that he knew both Sheppersons and that he recognized them as police officers even though they were not in uniform at the time of the arrest and search.

Mrs. Alice Ford, in her testimony, said that she leased the apartment and the defendant moved in during March of 1959. On the morning of January 17 she heard Patrolman Shepperson come for the defendant and tell him that the police wanted to talk with him. She saw the defendant leave with the patrolman and return in about 20 minutes with the patrolman and Detective Shepperson. She testified that the policemen did not ask her permission to search but that she had offered no protest to the search.

Patrolman William Shepperson testified that he had seen the defendant on the evening of January 16 at the cocktail lounge. Later that evening Detective Shepperson told him that he wanted to pick up the defendant for questioning. At about 1:30 A. M. on January 17, they went to the apartment at 205 Rosemont Place. The patrolman rang the bell and when the defendant answered, he asked the defendant to get dressed to go to City Hall. He and the defendant went to the car which was parked at the rear of the building, where Detective Shepperson waited. He got into the front seat of the car and started the engine, and the defendant also got into the car. Detective Shepperson asked the defendant about the robbery but he denied committing it. Then the detective asked him if they could search the apartment and he said, "all right." They got out of the car, which had remained parked, and the defendant let the police officers into the apartment by unlocking the door. Detective Shepperson asked Mrs. Ford for permission to search the apartment and

she stated that she didn't care. The officers then found the gun, cap, and trench coat while searching the bedroom. The cap and the trench coat were found in the bedroom closet. The gun, which was loaded, was found wrapped in a plastic bag under a pile of clothing stuffed up on the closet shelf.

Detective Robert Shepperson testified that while he, the patrolman and the defendant were in the car outside the apartment house, he asked about the robbery and the defendant denied committing it; he then asked if it was all right to search the apartment and the defendant replied "yes." The officers and the defendant then got out of the car and the defendant let them into the apartment with his key. Detective Shepperson said that he knew from his prior investigation that the lease to the apartment was in Mrs. Ford's name and that therefore he asked for her permission to search, which she gave. The detective also testified that on the night of the robbery he had received information that the defendant was seen running from the scene of the crime with a bundle under his overcoat, and that prior to arresting the defendant Mrs. Ireland had identified the defendant as the robber from a picture shown to her. He also testified that he had not attempted to obtain an arrest or a search warrant prior to the defendant's arrest.

The trial judge resolved the factual issue in favor of the State, determining that the search was made pursuant to consent given by the defendant and Mrs. Ford. On the defendant's appeal, the Appellate Division in reversing his conviction held that the State had failed to prove that the defendant's consent to the search had been voluntarily given. It said:

"We conclude that the testimony of the police officer and detective, even though accepted as true, did not warrant a finding that defendant's consent was freely given. At the time defendant said 'all right' or 'yes' he was alone with two officers at about one-thirty in the morning, and was sitting in a police car parked in the rear of the apartment premises. He was under arrest, in custody and charged with the commission of a serious crime. Such an atmosphere is more conducive to a yielding to police authority than to the free and intelli-

gent waiver by defendant of his constitutional rights." 84 *N. J. Super.*, at *p.* 302

## I.

The primary question on this appeal is whether the defendant voluntarily gave his consent to the search of the apartment. The general principles of law which govern this issue are well settled. When an accused consents to a search of his premises, he relinquishes the Fourth Amendment protection which prohibits unreasonable searches and seizures. *United States v. Smith,* 308 *F. 2d* 657, 663 (2 *Cir.* 1962), *cert.* denied 372 *U. S.* 906, 83 *S. Ct.* 717, 9 *L. Ed. 2d* 716 (1963). Implicit in the very nature of the term "consent" is the requirement of voluntariness. To be voluntary the consent must be "unequivocal and specific" and "freely and intelligently given." *Judd v. United States,* 89 *U. S. App. D. C.* 64, 66, 190 *F. 2d* 649, 651 (*D. C. Cir.* 1951). The burden of proof is on the State to establish by clear and positive testimony that the consent was so given. *Ibid.* However, application of these general principles on a case by case basis has often been difficult. There have evolved a number of factors which courts have weighed in determining whether acquiescence to a search has been voluntarily given.

Among those factors which courts have considered as tending to show that the consent was coerced are: (1) that consent was made by an individual already arrested, see *Channel v. United States,* 285 *F. 2d* 217 (9 *Cir.* 1960); (2) that consent was obtained despite a denial of guilt, see *Higgins v. United States,* 93 *U. S. App. D. C.* 340, 209 *F. 2d* 819 (*D. C. Cir.* 1954); and *Judd v. United States, supra;* (3) that consent was obtained only after the accused had refused initial requests for consent to search, see *United States v. Ziemer,* 291 *F. 2d* 100 (7 *Cir.*), *cert.* denied 368 *U. S.* 877, 82 *S. Ct.* 120, 7 *L. Ed. 2d* 78 (1961); (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered, see *Higgins v. United States, supra; United States v. Busby,*

126 *F. Supp.* 845 (*D. D. C.* 1954); (5) that consent was given while the defendant was handcuffed, see *Channel v. United States, supra; United States v. Burgos,* 269 *F.* 2d 763 (2 *Cir.* 1959), cert. denied 362 *U. S.* 942, 80 *S. Ct.* 808, 4 *L. Ed.* 2d 771 (1960).

Among those factors which courts have considered as tending to show the voluntariness of the consent are: (1) that consent was given where the accused had reason to believe that the police would find no contraband, see *United States v. Dornblut,* 261 *F.* 2d 949 (2 *Cir.* 1958), cert. denied 360 *U. S.* 912, 79 *S. Ct.* 1298, 3 *L. Ed.* 2d 1262 (1959); *United States v. Martin,* 176 *F. Supp.* 262, 268 (*S. D. N. Y.* 1959); (2) that the defendant admitted his guilt before consent, see *United States v. Mitchell,* 322 *U. S.* 65, 64 *S. Ct.* 896, 88 *L. Ed.* 1140 (1944), and *State v. Bindhammer,* 44 *N. J.* 372 (1965); (3) that the defendant affirmatively assisted the police officers, see *United States v. Burgos, supra; United States v. Smith, supra.*

It should be noted that the existence or absence of one or more of the above factors is not determinative of the issue. For example, many decisions have sustained a finding that consent was voluntarily given even though the consent was obtained under the authority of the badge or after the accused had been arrested. See cases cited in *United States v. Page,* 302 *F.* 2d 81, 84 *fn.* 10 (9 *Cir.* 1962).

Since the factors mentioned above are only guideposts to aid a trial judge in arriving at his conclusion, they cannot purport to lay down rules of law which preclude him from determining the issue of voluntariness of consent by his consideration of the totality of the particular circumstances of the case before him. Every case necessarily depends upon its own facts. Thus, the existence or absence of one or more of the factors mentioned above may be of great significance in the circumstances of one case, yet be of slight significance in another.

The trial judge is in a better position to weigh the significance of the pertinent factors than is an appellate tribunal.

He has the advantage of seeing and hearing the witnesses so that he can not only evaluate their credibility but also can gain a "feel" of the case which the cold record denies to a reviewing court. As was said in *United States v. Page, supra,* at *p.* 84: "We sometimes tend to forget that the testimony of a witness, presented to us in a cold record, may make an impression upon us directly contrary to that which we would have received had we seen and heard that witness." This viewpoint was articulated by Justice Hall, writing for this Court, in *State v. Johnson,* 42 *N. J.* 146, 161 (1964).[1] We there held that an appellate tribunal in a criminal case should not disturb the trial court's findings of fact, whether under- lying or ultimate, unless it is thoroughly satisfied that such findings are plainly unwarranted by the evidence in the rec- ord. *Id.,* at *pp.* 162–163.

The fact that the present case has to do with an ulti- mate finding of fact of constitutional dimension does not com- pel a different standard of appellate review. In *United States v. Page, supra,* the 9th Circuit Court, sitting *in banc,* care- fully set forth a similar standard for appellate review. There it was held that the determination whether consent was vol- untarily given is a factual issue to be decided by the trial judge; and the appellate court should reverse only when it finds that determination to be *clearly erroneous. Id.,* 302 *F. 2d,* at *p.* 85.

[1] "The contention that the trial court erred in its determination of the facts, whether underlying or ultimate, may be urged on appeal in any nonjury case, as the defendant did here in the Appellate Division. The appellate tribunal's obligation is the same—no greater and no less—in each type of such cases, recognizing, however, the legal dif- ferences in the required burden of proof, *e. g.,* beyond a reasonable doubt in criminal and *quasi*-criminal proceedings as against fair pre- ponderance of the evidence, generally, in civil actions. It must review the record in the light of the contention, but not initially from the point of view of how it would decide the matter if it were the court of first instance. It should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy. (See the discussion by Brochin and Sandler, *supra,* on the 'credibility' factor, 12 *Rutgers L. Rev.,* at *pp.* 484–490)."

█ We have concluded that the Appellate Division erred in holding that the trial judge's findings were plainly unwarranted by the facts before him.

It is true that there are certain factors in the case which could lead to the view that the defendant's consent to the search of the apartment was not voluntarily given. As the Appellate Division noted, the defendant at the time he consented was alone with two police officers at 1:30 in the morning. He was sitting in a police car parked in the rear of the apartment premises and had already been arrested and charged with the commission of the robbery. We also note that he had denied his guilt. On the other hand, there are a number of factors which tend to show that the defendant's consent to the search was voluntarily given. When the consent was given in the automobile, the defendant was seated in the back seat and the two officers were seated in front. He was not manacled and he testified that in getting into the car, "nobody put their hands on me." He knew both of the officers. Indeed, he testified that Patrolman Shepperson had spoken to him on a first-name basis several hours before his arrest. Of particular importance is the undisputed fact that without protest he affirmatively assisted the police officers in that he used his own key to personally admit them to the apartment. Another significant factor here is that the police officers told the defendant that they wanted to search the apartment for the stolen money and pocketbook. Neither was found, and it could well be that defendant consented with the thought that there was nothing in the apartment which would connect him with the robbery. And even if he thought the gun might possibly connect him with the crime, it could be that he thought the gun would not be discovered since it was hidden in a pile of clothes stuffed up on the shelf in the bedroom closet. Finally, the record discloses that the defendant represented himself at the first trial in this case, which resulted in a disagreement. On the motion to suppress, the trial judge, in view of this fact and in the light of his opportunity to see and hear the defendant, might reasonably have

concluded that he was the type of person unlikely to bend to the will of the police officers in the circumstances. See *United States v. Martin, supra*, 176 *F. Supp.*, at *p.* 267.

The weight to be given both sets of the above factors was peculiarly one for the trial judge. We find sufficient evidence in the record to justify his determination. We do not have "a definite conviction that the judge went so wide of the mark, a mistake must have been made." *State v. Johnson, supra*, 42 *N. J.*, at *p.* 162.

This conclusion makes it unnecessary for us to consider the State's further contention that the search and seizure was incidental to a lawful arrest of the defendant.

## II.

 Shortly after his arrest the defendant was placed in what is commonly known as a police lineup. Mrs. Ireland and Mrs. Clancy identified him at that time as the robber. Pursuant to Mrs. Ireland's request, the defendant was told to repeat the words Mrs. Ireland said the robber used at the time of the crime. When the defendant did so, Mrs. Ireland definitely identified him as the culprit. The defendant contended before the Appellate Division that the trial court committed plain error in violation of his privilege against self-incrimination by permitting identification evidence based upon the voice demonstration described above. The Appellate Division rejected his contention, stating that the sound of a person's voice is an identifying characteristic within the meaning of *N. J. S.* 2A:84A–19 (Rule 25)[2] and may be admissible against the defendant if it was obtained in a manner which

---

[2] The statute provides:

"Subject to Rule 37, every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate, except that under this rule:

(a) no person has the privilege to refuse to submit to examination for the purpose of discovering or recording his corporal features and other identifying characteristics or his physical or mental condition;
\* \* \* \* \* \* \* \*"

did not violate fundamental fairness. 84 *N. J. Super.*, at *p.* 303. We agree with the Appellate Division's conclusion that a voice demonstration is within the meaning of the statute. The Appellate Division did not pass upon whether the defendant's Fifth Amendment rights had been violated. Recently, the United States Supreme Court in *Malloy v. Hogan*, 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed.* 2d 653 (1964), held that the Fifth Amendment privilege of an accused against self-incrimination is applicable to the states.

We have concluded, however, that the defendant's constitutional rights have not been infringed in this case. Historically, the privilege against self-incrimination originated as a reaction to the practice in the early English courts of compelling a witness to be sworn and give testimony concerning his guilt or innocence. See 8 *Wigmore, Evidence* § 2250 (*McNaughton rev.* 1961) and Weintraub, "Voice Identification, Writing Exemplars and the Privilege Against Self-Incrimination," 10 *Vand. L. Rev.* 485, 486–490 (1957). In the light of this history the text writers and the overwhelming majority of the courts have limited the scope of the privilege to what *Wigmore* characterizes as "testimonial compulsion," *i. e.,* "compulsion to do those things which a witness would by traditional judicial processes be required to do." *McCormick, Evidence* § 126 and cases cited therein (1954). 8 *Wigmore, op. cit. supra* § 2263; *Maguire, Evidence of Guilt* § 2.04 (1959); and Weintraub, *supra.*

Therefore, certain types of examination or inspection are outside of the scope of the privilege because non-testimonial in character. For example, fingerprinting, photographing, examination of the body of a person for identifying characteristics, drunkometer tests and blood tests, all may be compelled since to do so does not require the witness to disclose any knowledge he might have. See 8 *Wigmore, op. cit. supra,* at § 2265. See also *State v. Alexander,* 7 *N. J.* 585 (1951), *cert.* denied 343 *U. S.* 908, 72 *S. Ct.* 638, 96 *L. Ed.* 1326 (1952); *Bartletta v. McFeeley,* 107 *N. J. Eq.* 141 (*Ch.* 1930), affirmed 109 *N. J. Eq.* 241 (*E. & A.* 1931).

Dean Wigmore and Professor McCormick recognize that requiring a suspect to speak for identification is not clearly non-testimonial. Both, however, conclude that it falls outside of the scope of the privilege. 8 *Wigmore, op. cit. supra* § 2265, at *pp.* 395–396; *McCormick, op. cit. supra* § 126, at *p.* 266. But see Weintraub, *supra,* at *pp.* 506–507. We conclude that voice identification as in this case is non-testimonial in character and therefore the privilege against self-incrimination is inapplicable.

### III.

We have considered the remaining issues and find no error.

The judgment of the Appellate Division is reversed and the judgment of the trial court is reinstated.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.