# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the intiernet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2215-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ISAIAH W. BANKSCAREY,
a/k/a ISAIAH BANKS CAREY,

    Defendant-Appellant.

_____

Submitted January 6, 2025 – Decided June 18, 2025

Before Judges Gummer and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment Nos. 19-10-2134 and 21-10-1597.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Rachel A. Neckes, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Amanda G. Schwartz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Isaiah Banks-Carey appeals his convictions by guilty plea on multiple counts of aggravated sexual assault.[1] He also appeals a prior order denying his motion to suppress the results of a DNA buccal swab to which he had consented. Defendant committed the assaults against his girlfriend's daughters, who were thirteen years old or younger when defendant first impregnated them. We vacate the fines and monetary penalties imposed as part of his sentence and remand the case so the trial court can conduct an ability-to-pay hearing and state its reasons for imposing any fines or monetary penalties. We otherwise affirm.

## I.

On or about March 7, 2019, the Atlantic County Prosecutor's Office received a referral from the Division of Child Protection and Permanency (Division) about two pregnant girls: twelve-year-old Kelly and thirteen-year-old Taylor.[2] Their mother, Kara, learned the girls were pregnant when she took them to a hospital after noticing a difference in their bodies. Defendant was in

---

[1] According to defendant, Banks-Carey is the correct spelling and punctuation of his name.

[2] We use pseudonyms in accordance with Rule 1:38-3(c)(9) and N.J.S.A. 2A:82-46.

a dating relationship with Kara and lived with her and her daughters. Taylor gave birth on March 17, 2019.

Detective Danielle Rosiello interviewed the girls on March 26, 2019. They initially denied having any sexual intercourse with defendant. Detective Jose Rodriguez and Detective Rosiello interviewed Kara the same day. Both detectives later testified at the suppression hearing. After Kara provided information about her relationship with defendant, Detective Rodriguez spoke to defendant over the phone. He told defendant the girls had been interviewed. He asked defendant if he would submit to a buccal swab so that his DNA could be compared to the DNA of Taylor's baby. According to Detective Rodriguez, defendant said he wanted to help and agreed to submit to the buccal swab. They scheduled March 29, 2019, as the day defendant would appear for the buccal swab.

On March 27, 2019, defendant cancelled the appointment, stating he wanted to postpone the swabbing until after Kelly's baby was born. Detective Rodriguez testified he had explained to defendant, "it would be good if we could obtain his DNA profile now" and the State could save the profile and later compare it to the baby's profile once a sample was obtained from the baby. According to Detective Rodriguez, defendant did not refuse to submit to the

A-2215-22

buccal swab; he just indicated he preferred to wait. On April 8, 2019, defendant contacted Detective Rodriguez to schedule the buccal swab. They scheduled the appointment for later that week, but defendant did not appear on the scheduled date and did not respond to the detective's follow-up calls and texts. Sergeant Carlton Durhim, who was involved in the investigation and testified at the suppression hearing, described his impression of defendant's actions:

> the totality of [defendant's] participation all the way from the beginning when he was supposed to be giving his DNA swab. He never refused. Things came up and he had to change appointments. All those other things that went there, he never acted like he did not want to cooperate in the investigation. It seemed like in my opinion, he wanted to participate in the investigation including to provide his DNA to get this all cleared up.

The detectives investigated other men as potentially being the fathers of the girls' children. The detectives eliminated them based on DNA test results, timing, and statements from the girls and the men. The prosecutor's office received a second referral from the Division at the end of April. According to the referral, Taylor told someone she had performed oral sex on defendant and defendant had touched Kelly's buttocks when she was in the shower.

Kelly gave birth on June 12, 2019. The detectives went to the hospital and obtained DNA samples from Kelly and her baby by performing buccal swabs. Kara was at the hospital. She contacted Taylor and defendant to set up

4

a meeting later that day at her home when the detectives could obtain samples from them and Taylor's baby. According to Detective Rodriguez, he asked Kara to contact them. Detective Rosiello testified Kara had told them she "was going to contact [defendant] to meet [them] at the house, so that [the detectives] could get his sample," but she also indicated she was not sure who brought up the subject. According to Kara, who also testified at the suppression hearing, she was not following instructions from the detectives when she called defendant and asked him to meet them at the house. On the way to the house, Detective Rosiello filled out a consent form for defendant with basic information such as his name, who would be present, who would be taking the sample, and the sample that was going to be taken.

Defendant was already at the house when the detectives arrived. After the samples were obtained from Taylor and the baby, Detective Rosiello read the consent form to defendant and explained to him the form and the procedure that would be followed: Detective Rodriguez would be swabbing the inside of his cheek and the sample taken from his cheek would be sent to a lab to find out if he was a contributor to the babies' DNA. The consent form contained the following statement, among others: "I have been further advised that I may withdraw my consent at any time and for any reason . . . ." Detective Rosiello

5

explained to defendant he could withdraw his consent at any time and if he withdrew his consent, he could contact Detective Rodriguez. According to Detective Rosiello, if defendant had called Detective Rodriguez and advised him he was withdrawing his consent, Detective Rodriguez would have contacted the lab and made sure it stopped testing the sample. After defendant was given time to read the consent form, he signed it and submitted to the buccal swab. The detectives did not observe anyone speaking with defendant or pressuring or coercing him into giving his consent.

On September 4, 2019, a DNA laboratory report indicated defendant was the parent of the offspring of both girls. Based on those DNA results, Detective Rodriguez arrested defendant and told him he was under arrest because the DNA results showed he was the father of the girls' children. While defendant was being transported to the prosecutor's office, Taylor and Kelly were interviewed and identified defendant as the father of their children.

At the prosecutor's office, Sergeant Durhim and Detective Rodriguez conducted an interrogation of defendant after he was advised of his rights pursuant to Miranda v Arizona, 384 U.S. 436 (1966), stated he wanted to speak with the detectives, and signed a Miranda card. During the recorded interrogation, defendant admitted to performing oral sex on both girls, admitted

6

to having sexual intercourse with Taylor, and initially denied having sexual intercourse with Kelly. He suggested she may have taken his semen from a used condom and later in the interrogation stated he could not admit or deny whether he had had sexual intercourse with Kelly because he had blacked out due to alcohol consumption and was unable to remember.

After the interrogation ended, Detective Rodriguez prepared a complaint warrant. A grand jury subsequently issued an indictment charging defendant with: six counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); one count of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and seven counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).

Defendant moved to suppress his recorded statement and the results of the buccal swab. In support of his motion, defendant argued he had invoked his right to remain silent and the detectives failed to honor that invocation, rendering defendant's statement inadmissible. Defendant also argued the State had violated his rights under the Fourth Amendment of the United States Constitution and Article I, paragraph seven, of the New Jersey Constitution to be free from unreasonable searches and seizures when the detectives obtained the DNA sample from the buccal swab.

A-2215-22

The Honorable Sarah Beth Johnson, J.S.C., conducted an evidentiary hearing on the motion to suppress. Detective Rodriguez and Sergeant Durhim testified on behalf of the State. Defendant called as witnesses Detective Rosiello, Kara, and a psychologist.

According to Kara, the detectives did not request at the hospital that she contact defendant about submitting to a buccal swab and did not tell her to say anything to defendant. She testified she had reached out to defendant to find out if he could go to the house and submit to the test because the detectives would be there taking a sample from Taylor. When asked if she had ever threatened defendant to "get a blood test," she responded, "Absolutely, all the time. If you don't get a blood test, my brother is going to kick your butt." When asked if defendant was at the house voluntarily and had voluntarily submitted to the buccal swab, she responded, "[y]es" and added "he had no choice because [she] was harassing him every day about it."

At the beginning of the third day of the hearing, the assistant prosecutor advised the court Taylor had given birth again and DNA tests showed defendant was the father of that child. She also told the court a complaint warrant had been issued, charging defendant with additional counts of first-degree aggravated sexual assault and endangering the welfare of a child. A grand jury

subsequently issued a superseding indictment, including the same charges as the original indictment and adding additional counts each of: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(C); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).

At the end of the hearing on March 26, 2021, the judge entered an order and placed a decision on the record denying defendant's motion. Regarding defendant's recorded statement, the judge held defendant was advised of his Miranda rights and knowingly and voluntarily had waived them. Defendant does not appeal that aspect of the court's decision. Regarding defendant's argument he had not voluntarily consented to the buccal swab, the judge found defendant had not refused to submit to the swab, explaining, "I understand that an appointment was made in late March and the testimony which I found to be credible was that [defendant] indicated, well I don't want to give . . . the DNA sample until after the second baby is born."

The judge also rejected defendant's argument his consent was not voluntary due to the threats and pressure from Kara, finding:

> they got the DNA from the second baby as well as the mother, with [Kara's] consent. Then [Kara] arranged, I think the testimony is clear that she arranged for [defendant] to be at the house with her other daughter

and the other baby. And at the house, Detective Rosiello testified to this, Detective Rodriguez testified to this, they went to the house. The house was quiet. They didn't observe any negative interaction between [Kara] and [defendant] at the house. [Defendant] showed up there voluntarily. It's my recollection of the testimony that he was there before police got there. So it wasn't like [Kara] you know, had somehow lured him to the house. She told him to go to the house and she told him what for and he went. He was waiting there when the police got there with one of the minor victims. It was he and the minor victim alone.

The judge rejected any suggestion Kara had been acting as an arm of law enforcement, finding:

> ultimately [Kara] is not part of law enforcement. She is not an agent of the State. She is not . . . a vessel or an arm of the State. Again, she was not even actually in the same room when [defendant] gave the sample. So whether he felt some sort of moral compulsion, some sort of social coercion to participate in this, does not make it involuntary, unknowing or unintelligent under the law.

The judge considered the totality of the circumstances, finding "under the totality of the circumstances it's pretty clear that he was comfortable where he was. He was comfortable being in [Kara's] house at the time. He voluntarily showed up there. Then the detectives presented him with the consent form . . . which he signed." The judge concluded:

> under the totality of the circumstances, I also find that the defendant was appropriately advised of what was

A-2215-22

going to happen with the buccal swab by Detective Rosiello, that he was appropriately advised of how he could withdraw that sample if he wanted to. He choose [sic] not to do it, and I find that under the circumstances, totality of the circumstances the State has proved beyond a reasonable doubt that his provision of the sample was knowing, voluntary, and intelligent. So I am denying the defense's motion in that regard as well.

On August 11, 2022, pursuant to a negotiated plea agreement, defendant pleaded guilty to two counts of first-degree aggravated sexual assault pursuant to N.J.S.A. 2C:14-2(a)(1), and one count of first-degree aggravated sexual assault pursuant to N.J.S.A. 2C:14-2(a)(2)(c). The State agreed to the dismissal of the remaining charges. During the plea hearing, defendant admitted: he knew Taylor was twelve years old when he had vaginal intercourse with her, resulting in her becoming pregnant for the first time; he knew Kelly was eleven years old when he engaged in vaginal intercourse with her, resulting in her becoming pregnant; and he again had vaginal intercourse with Taylor, when she was thirteen years old, resulting in her becoming pregnant again.

At the sentencing hearing, the court sentenced defendant to concurrent twenty-five-year terms of imprisonment for the first-degree aggravated-sexual-assault convictions pursuant to N.J.S.A. 2C:14-2(a)(1) and a concurrent ten-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2,

11

for the first-degree aggravated-sexual-assault conviction pursuant to N.J.S.A. 2C:14-2(a)(2)(c).  Each sentence was subject to Megan's Law, N.J.S.A. 2C:7-1 to -23, and parole supervision for life.  The court also imposed fines and monetary penalties, including a $2,000 per conviction fine in connection with the Sex Crime Victim Treatment Fund pursuant to N.J.S.A. 2C:14-10 and a $10 monthly penalty in connection with the Sex Offender Supervision Fund pursuant to N.J.S.A. 30:4-123.97.  The court entered a judgment of conviction on March 13, 2023.

This appeal followed.  Defendant raises the following arguments for our consideration:

> POINT I
>
>> THE FRUIT OF MR. BANKS-CAREY'S BUCCAL SWAB SEARCH MUST BE SUPRESSED BECAUSE HE DID NOT VOLUNTARILY CONSENT TO PROVIDING A DNA SAMPLE.
>
> POINT II
>
>> RESENTENCING IS REQUIRED BECAUSE THE COURT IMPROPERLY IMPOSED FEES AND PENALTIES WITHOUT STATING ITS REASONS OR CONSIDERING MR. BANKS-CAREY'S ABILITY TO PAY.
>>
>> A. The court erred in assessing a $6,000 fee under N.J.S.A. 2C:14-10.

12

B. The court erred in assessing a $10 per month
penalty under N.J.S.A. 30:4-123.97.

In response, the State contends the trial court correctly determined defendant's consent to the buccal swab was knowing and voluntary. The State also argues the detectives would have acquired a DNA sample from defendant as part of standard police procedure and, consequently, the DNA evidence at issue would be admissible under the inevitable-discovery and independent-source doctrines. The State acknowledges the court at sentencing did not provide reasons for the fines and monetary penalties imposed and concedes the case should be remanded so the court can conduct an assessment of defendant's ability to pay and place on the record its reasons for imposing any fees or penalties.

II.

We first address defendant's contention the trial court erred in denying his suppression motion based on a finding he had knowingly and voluntarily consented to the buccal swab.

"We review the trial court's determination of defendant's motion to suppress under a deferential standard." State v. Miranda, 253 N.J. 461, 474 (2023). "[W]e must uphold the factual findings underlying the trial court's

decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (alteration in original) (quoting State v. Nyema, 249 N.J. 509, 526 (2022)) (internal quotation marks omitted); see also State v. Lamb, 218 N.J. 300, 313 (2014) ("[a]ppellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record."). "We accord deference to those factual findings because they 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Lamb, 218 N.J. at 313 (alteration in original) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). Thus, we "ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (internal quotation marks omitted) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). "We review de novo the trial court's legal conclusions and its determination of the consequences that flow from established facts." Miranda, 253 N.J. at 475.

The United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures. U.S.

14                                                                    A-2215-22

Const. amend. IV; N.J. Const. art. I ¶ 7; Miranda, 253 N.J. at 475. A "cheek swab for the purposes of obtaining a DNA sample" is a search. State v. Lentz, 463 N.J. Super. 54, 68 (App. Div. 2020) (quoting State v. O'Hagen, 189 N.J. 140, 149 (2007)). "[B]ecause a buccal swab constitutes a search, it must be obtained in a manner consistent with constitutional search and seizure principles for valid use in a criminal prosecution." State v. Carney, 239 N.J. 282, 300 (2019); see also State v. K.H., ___ N.J. Super. ___, ___ (App. Div. 2025) (slip op. at 12-13) (applying constitutional principles to determine admissibility of DNA evidence obtained in a buccal swab).

"[I]n order for a search to be constitutional, police officers 'must obtain a warrant or show that a recognized exception to the warrant requirement applies.'" Miranda, 253 N.J. at 475 (quoting State v. Wright, 221 N.J. 456, 466 (2015)). "[O]ne of the specifically established exceptions to the requirements of . . . a warrant . . . is a search that is conducted pursuant to consent." Id. at 475-76 (alteration in original) (quoting Shneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). "Obtaining voluntary consent to conduct a buccal swab is one way to obtain a constitutionally valid swab without a search warrant." State v. Camey, 239 N.J. 282, 300 (2019).

"It is fundamental that the consent to search be voluntary." State v. Amang, ___ N.J. Super. ___, ___ (App. Div. 2025) (slip op. at 16). "[C]onsent must be voluntarily given and not the result of duress or coercion, express or implied." Lamb, 218 N.J. at 315. Under the New Jersey Constitution, a consent to search is valid only if the State proves the person giving consent knew he or she had the right to refuse. Amang, ___ N.J. Super. at ___ (slip op. at 16).

"To act voluntarily is to act with a free and unconstrained will, a will that is not overborne by physical or psychological duress or coercion." State v. Carvajal, 202 N.J. 214, 226 (2010). "To ensure validity, warnings given to an individual informing about the right to refuse consent help the State later carry its burden to demonstrate that the consent was truly a voluntary, knowing, and intelligent waiver of the right to be free of such an intrusion." Camey, 239 N.J. at 300. Factors indicating coercion include:

> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.

16

> [State v. Hagans, 233 N.J. 30, 39 (2018) (alteration in original) (quoting State v. King, 44 N.J. 346, 352-53 (1965)).]

On the other hand,

> Factors potentially indicating voluntariness of consent include: "(1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers."
>
> [Id. at 39-40 (alteration in original) (quoting King, 44 N.J. at 353).]

The State must prove voluntariness by "clear and positive testimony." K.H., ___ N.J. Super. at ___ (slip op. at 13) (quoting King, 44 N.J. at 352). A court considers the totality of the circumstances when determining whether a consent to a search was voluntary and knowing. Ibid.

The prohibition against unreasonable searches and seizures applies only to actions by the state. State v. Shaw, 237 N.J. 588, 608 (2019); In re J.A., 233 N.J. 432, 451-52 (2018). However, when a private citizen acts "in concert" with police officers, the private citizen's actions are treated as state action. J.A., 233 N.J. at 452. "[I]t is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to

accomplish." Norwood v. Harrison, 413 U.S. 455, 465 (1973); see also United States v. Va., 518 U.S. 515, 599 (1996) (same).

We perceive no basis to disturb the trial court's finding defendant knowingly and voluntarily consented to the buccal swab. That finding was supported by sufficient credible evidence in the record. After Taylor's first baby was born, defendant told Detective Rodriguez he wanted to help and he agreed to submit to the buccal swab. He cancelled the initial appointment, stating he wanted to postpone the swabbing until after Kelly's baby was born. After Kelly's baby was born, defendant went to Kara's house, knowing the detectives were going there to perform buccal swabs on Taylor and her baby. After the swabs were performed on them, Detective Rosiello read the consent form to defendant and explained the form and the buccal swab procedure to him. She told him the sample taken from him would be sent to a lab to determine if he had contributed to the babies' DNA. She advised him he could withdraw his consent at any time by contacting Detective Rodriguez; defendant had his contact information, having communicated with him directly and previously by telephone.

What happened next? Defendant executed the consent form, submitted to the buccal swab, and did not subsequently withdraw his consent. The totality of

those circumstances demonstrates the knowing and voluntary nature of defendant's consent to the buccal swab.

We also see no basis to conclude defendant's consent was coerced by the State, through the actions of either the detectives or Kara. Application of the King factors does not lead us to conclude the court erred in finding defendant's consent was not coerced. See King, 44 N.J. at 352-53. Although defendant must have known the DNA tests could establish him as the father of the children's offspring, he was not arrested or handcuffed when he gave his consent; his buccal swab was performed after the birth of Kelly's baby, as he had requested; nothing in the record indicates he had made a statement to law-enforcement officers either admitting or denying his guilt; and he appeared at Kara's house knowing the detectives would be there to collect the DNA samples. That does not bespeak coercion.

The record also is devoid of any evidence the detectives took actions or made statements in an effort to pressure or mislead defendant into giving his consent. To the contrary, they performed the buccal swab based on the timing he had requested – after the birth of Kelly's baby – and after fully explaining to him the consent form, the buccal-swab procedure, the purpose of the procedure, and his ability to withdraw his consent.

Given the lack of evidence linking the detectives to any coercive conduct, defendant turns to Kara, portraying her as an arm of the State. The court accepted as credible Kara's testimony that she was not acting on any instructions from the detectives when she called defendant and asked him to meet them at the house when they would be collecting DNA samples. We have no basis to disturb that credibility determination. And even if the detectives had asked Kara to contact defendant about meeting at the house, that request does not equate to the "induce[ment], encourage[ment] or promot[ion] of [a] private person[] to accomplish what [the State] is constitutionally forbidden to accomplish." Norwood, 413 U.S. at 465.

Defendant focuses on Kara's purported harassment of defendant and her threat to have her brother "kick [his] butt." We may not know exactly what Kara meant when she said she had been "harassing" defendant about submitting a sample. But we know nothing in the record links the detectives to that behavior. Kara testified credibly that the detectives had not told her to say anything to defendant. And we know nothing threatening or harassing happened at the house before defendant consented to and submitted to the buccal swab.

Defendant's reliance on State v. Kelly, 61 N.J. 283 (1972), is misplaced. In that case, according to the defendant, he wrongfully confessed to stealing a

security guard's gun "to avoid getting hurt" when that uniformed security guard accompanied by other uniformed security guards "had [his] arms twisted about where [his] shoulders were." Id. at 286. That is not this case. As the mother of two impregnated children, Kara asking her boyfriend, even in strong terms, to submit a DNA sample that would prove or disprove his paternity isn't unlawful coercion rendering involuntary his consent, especially in light of the totality of the circumstances. As the court found, any "moral compulsion" defendant may have felt did "not make [his consent] involuntary, unknowing or unintelligent under the law."

For all of these reasons, we affirm the March 26, 2021 order denying defendant's suppression motion. Because we affirm that order, we do not address defendant's argument that his recorded statement should be suppressed as the "fruit" of an unconstitutional search. We also do not address the State's arguments based on the inevitable-discovery and independent-source doctrines.

Defendant contends the sentencing court did not conduct an ability-to-pay hearing before it imposed fees and monetary penalties pursuant to N.J.S.A. 2C:14-10 and N.J.S.A. 30:4-123.97, did not consider his financial status before imposing them, and did not explain its reasons for imposing them. The State recognizes the case should be remanded so the court can conduct an assessment

21                                                         A-2215-22

of defendant's ability to pay and place on the record its reasons for imposing any fees or penalties. Accordingly, we vacate the aspect of the March 13, 2023 judgment of conviction imposing fees and monetary penalties pursuant to N.J.S.A. 2C:14-10 and N.J.S.A. 30:4-123.97 and remand with instructions the trial court conduct an ability-to-pay hearing and explain its reasons on the record for imposing any fees or monetary penalties. See State v. Bolvito, 217 N.J. 221, 234-35 (2014) (holding a sentencing court setting a Sex Crime Victim Treatment Fund penalty "should consider the defendant's ability to pay the amount assessed" and "provide a statement of reasons when it sets a defendant's . . . penalty . . . ."). We otherwise affirm the convictions and sentence.

Affirmed in part; vacated in part; and remanded for proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division