**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5245-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MELVIN K. LEWIS, III a/k/a
MELVIN K. LEWIS,

    Defendant-Appellant.

_____

          Submitted April 11, 2018 — Decided July 9, 2018

          Before Judges Alvarez and Geiger.

          On appeal from Superior Court of New Jersey,
          Law Division, Salem County, Indictment No. 15-
          04-0201.

          Joseph E. Krakora, Public Defender, attorney
          for appellant (Michele A. Adubato, Designated
          Counsel, on the brief).

          John T. Lenahan, Salem County Prosecutor,
          attorney for respondent (David M. Galemba,
          Assistant Prosecutor, of counsel and on the
          brief).

PER CURIAM

Tried by a jury, defendant Melvin K. Lewis, III, was convicted of certain persons not to have weapons, N.J.S.A. 2C:39-7(b). On March 18, 2016, the trial judge commenced defendant's sentencing hearing. Defendant requested a three-day delay for medical reasons. He failed to return on the scheduled date, and thus was not sentenced until July 15, 2016, when the judge imposed the minimum five-year without parole term of imprisonment called for by the statute. Defendant appeals and we affirm.

At trial, Penns Grove Police Department Corporal Joseph Schultz testified he was dispatched to defendant's home on December 21, 2014, on a call regarding an attempted burglary. Schultz approached the residence as defendant was walking out onto the porch. Both men looked down and simultaneously saw a semi-automatic handgun on the ground in front of the doorway. A magazine lay alongside.

The officer asked defendant "what's going on, what happened[,]" and defendant responded that someone had tried to break into his home. While the officer secured the weapon, defendant told Schultz he believed the person intended to kill him.

Defendant explained that when he ignored the sound of the doorbell, the would-be intruder kicked and banged on the door. He heard a loud noise, assuming it was a gunshot. The officer saw a

small hole in the door consistent with a bullet and, a few minutes later, found a bullet lying in close proximity to the location of the handgun.

County Prosecutor's Investigator Jessica Venello responded immediately to Schultz's call, and defendant and the other adult present in the home when the incident occurred, defendant's girlfriend, drove to the police station to be interviewed. Venello began the taped interview by asking defendant what had happened. Defendant answered that he had a break-in at another property he owned, and when he returned home around 7:00 p.m., someone he did not know knocked and called out his name. Defendant told his girlfriend to go into the bedroom. Defendant added: "And all of a sudden, boom, boom, boom. The hole you see in the door is made by me. By a blank that saved my life. I have the gun at the house. I shot a .38 revolver blank. That's the hole in the door." Defendant then heard someone say "oh shit," the sound of something dropping, and running footsteps. Meanwhile, defendant's girlfriend called 911. Defendant was reluctant to tell police "but that blank saved my life. That blank saved my life. Made them drop their gun." He told the officers that he was not supposed to be in possession of firearms.

Defendant said he acquired the gun two days earlier because he heard his life was in danger. He went on to name certain

individuals he had confronted because they had been stealing from him. Defendant suspected they were planning to retaliate by putting out "a hit." The officers continued to interview defendant about the break-in at his other property and the alleged contract on his life. Defendant repeated his description of the shooting incident, and provided additional details regarding how he learned about the threat.

When defendant was driven back to his home from the police station, he was seated in the back of a police car but not handcuffed. Upon arrival, he pointed out the red bag containing a black revolver hidden beneath a living room couch. The gun held three bullets and one empty casing. Later on that evening, the officers ran a criminal history check and verified that defendant had been convicted of predicate offenses that barred him from possession of a firearm.

The State presented essentially the same testimony during the pretrial motion to suppress evidence. In his October 2, 2015 motion decision, Judge Benjamin C. Telsey described defendant during the taped interview as cooperative and having given "a very conversational statement." Defendant volunteered information regarding the circumstances that had led to the attack, and volunteered information about the weapon he had obtained two days earlier. Defendant did not hesitate in explaining his possession

of the weapon and suggested he take the officers back to his home so they could seize it. When defendant was interviewed, he was not under arrest, handcuffed, or had any reason to believe he was not free to leave. Obviously, defendant knew he was a person not to possess because he told the officers—rather than the officers learning about defendant's record after additional investigation.

Defendant may not have realized he was confessing to a crime because the bullets were blanks, but other than that, "he knew exactly what he was doing and what he was showing the police." He brought the officers into his home while being well "aware that he could speak up, stop the search, or stop what was happening. But, that wasn't even his intent at that point. Clearly, his intent was to cooperate with this investigation." The court further found that a defendant who volunteers evidence does so at his own peril. Accordingly, the court denied the motion to suppress the weapon.

On appeal, defendant raises the following points for our consideration.

> POINT I
> IT WAS ERROR TO DENY THE DEFENDANT'S MOTION
> TO SUPPRESS EVIDENCE.
>
> POINT II
> IT WAS PLAIN ERROR FOR THE TRIAL COURT TO FAIL
> TO CHARGE THE JURY ON SELF-DEFENSE.
> (Not raised below).

When reviewing motions to suppress, we uphold "the trial court's decision so long as [the factual] findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). This fundamental principle has particular significance when the findings of the trial court are "substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case," even if we might have reached a different conclusion. State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interest of justice demands intervention and correction.'" Ibid. (quoting Johnson, 42 N.J. at 162).

Under the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution, a warrantless search is presumed to be invalid, and places upon the State the burden to prove that the search "falls within one of the few well-delineated exceptions to the warrant requirement." State v. Pineiro, 181 N.J. 13, 19 (2004) (quoting State v. Maryland, 167 N.J. 471, 482 (2001)).

Consent is a well-recognized exception to the Fourth Amendment's search warrant requirement. Schneckloth v.

Bustamonte, 412 U.S. 218, 219 (1973). Consent searches have long been considered a "legitimate aspect of effective police activity." State v. Domicz, 188 N.J. 285, 305 (2006) (quoting Schneckloth, 412 U.S. at 228). A consent to search must be voluntary and knowing in nature, and the person giving consent must be advised of his right to refuse. State v. Johnson, 68 N.J. 349, 353-54 (1975). The State bears the burden of demonstrating the person giving consent knew he or she had a choice by clear and convincing evidence. Domicz, 188 N.J. at 309.

The New Jersey Supreme Court recently reiterated the analysis courts must employ when assessing voluntariness that was first outlined in State v. King, 44 N.J. 346, 352-53 (1965):

> Factors potentially indicating coerced consent include:
>
> > (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed. . . .
>
> Factors potentially indicating voluntariness of consent include:

> (1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers.
>
> [State v. Hagans, 233 N.J. 30, 39 (2018) (alterations in original) (citations omitted) (quoting King, 44 N.J. at 352-53).]

Citing to King, the Hagans Court described the factors as "guideposts," and observed that the absence of one alone may be very consequential in one case while insignificant in another. Id. at 40. The voluntariness of the consent depends on "the totality of the particular circumstances of the case[,]" and each situation must rise or fall on its own facts. Ibid. (quoting King, 44 N.J. at 353).

In this case, the State has readily met its burden. Police went to defendant's home to investigate an incident in which he was the victim, not a suspect. The information conveyed in the dispatch was confirmed when the officer and defendant simultaneously saw the weapon on the porch.

Defendant drove himself and his girlfriend to the police station voluntarily in order to assist police in their investigation of the attempted break-in. During his taped interview, while still viewed as a victim and not a suspect,

defendant explained that he had fired a revolver through the front door. Thus, defendant admitted his guilt before police even had any reason to suspect that he had committed a crime. His statements no doubt came as a surprise to the officers who were conducting the interview.

Defendant, while on tape, offered to show police where he had hidden the weapon, and told them that he was a convicted person not permitted to possess firearms. Defendant acknowledged his guilt and provided police with the location of the evidence.

None of the factors apply that would lead us to the conclusion defendant's consent was involuntary. He was not under arrest, was not handcuffed, faced no accusation, and was not asked for consent. The record therefore supports the judge's conclusion that defendant affirmatively volunteered the information that he had committed a crime and led the officers to the place where the weapon could be found. His decision was not coerced or involuntary. Therefore, defendant's motion to suppress was properly denied.

Defendant also contends that it was "plain error" for the court to have failed to charge the jury under the theory that defendant acted in self-defense. We consider this argument to be so lacking in merit as to warrant little discussion in a written opinion. R. 2:11-3(e)(2).

Defendant relies upon State v. Montalvo, 229 N.J. 300 (2017), in support of the argument. Montalvo, however, relates to a different statute. In Montalvo, defendant was charged with unlawful possession of a weapon, not possession of a weapon by a certain person. Id. at 307. Here, defendant does not dispute that he is a person prohibited from possession. See In re Wheeler, 433 N.J. Super. 560, 597-98 (App. Div. 2013) (citing District of Columbia v. Heller, 554 U.S. 570 (2008); McDonald v. City of Chicago, 561 U.S. 742 (2010)). That a person who has lost his right to arm himself by virtue of convictions can continue to be charged with the offense at issue here was a fundamental principle left intact by Heller and McDonald.

All that is required under the pertinent statute is that a defendant has been previously found guilty of a predicate offense and was in possession of the firearm. See N.J.S.A 2C:39-7(b). The thrust of the statute is that mere possession by a convicted person violates the law. Thus, self-defense is not a defense to the charge, and no instruction was necessary.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5245-15T3