**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4938-18T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SIWAN R. BROWN, a/k/a
SHAWN BROWN,

     Defendant-Appellant.

_____

Argued telephonically May 4, 2020 –
Decided June 11, 2020

Before Judges Sabatino, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 15-09-1253.

Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Office of the Public Defender, attorney; Daniel S. Rockoff, of counsel and on the briefs).

Lila B. Leonard, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewel, Attorney General of New Jersey, attorney; Lila B. Leonard, of counsel and on the briefs).

PER CURIAM

This narcotics case returns following a remand to the trial court directed in the unpublished portion of this court's[1] December 27, 2018 opinion. See State v. Brown, No. A-2838-16 (App. Div. Dec. 27, 2018) (full opinion) (slip op. at 1); and State v. Brown, 457 N.J. Super. 345 (App. Div. 2018) (published portion only).[2]

Defendant, Siwan R. Brown, appeals the trial courts renewed denial of his motion to suppress heroin found in his home. Tried by a jury, defendant was found guilty of various drug offenses. The State's case was largely based on the warrantless seizure of over one thousand bags of heroin and drug paraphernalia from a residence that defendant shared with other relatives.

The search and seizure process began when police officers pulled defendant over in his car pursuant to a lawful traffic stop several blocks from his home. After smelling marijuana, the officers requested that defendant step out of his car. Defendant then admitted to the police to having "two bundles" of

[1] Judge Mitterhoff participated with Judges Sabatino and Sumners in the 2018 opinion. Due to the annual change in Parts of the Appellate Division, Judge Mitterhoff was replaced in the present appeal by Judge Geiger.

[2] The published portion addressed a novel issue concerning jury requests to playback summations. Neither party sought Supreme Court review of that discrete issue.

heroin in his pockets. The officers seized the heroin, placed defendant under arrest, handcuffed him, and searched his car. They found marijuana in the center console.

The officers then asked defendant where he lived, and sought his consent to search his home, which was a short distance away. Defendant orally consented at the roadside to a search of his home. Defendant was driven home in the back of a police car, while another officer drove defendant's car back to the home.

Once inside, defendant signed the first of two consent-to-search forms. According to defendant, he attempted to limit the scope of the search to his room by writing the word "room" on the form. Defendant was briefly unhandcuffed in order to sign the form and unlock the door to his room.

After finding drug paraphernalia but no drugs in the first room, the officers obtained defendant's oral consent to search a second room, where more drug paraphernalia was visible. Defendant's uncle then allowed the police into a third room, where they observed a safe. The police obtained defendant's written consent to search that safe. The police found 1,050 bags of heroin inside the safe.

A-4938-18T1

Defendant's pretrial suppression motion was denied by the trial court after an evidentiary hearing. The case went to trial and defendant was convicted of multiple counts of drug offenses. The court sentenced defendant to an aggregate term of eighteen years, with a nine-year period of parole ineligibility.

Defendant appealed, and we upheld several aspects of case. However, we remanded the case for the trial court to analyze fully the coercion and offsetting factors set forth in State v. King, 44 N.J. 346 (1965), which bear upon the voluntariness of a defendant's consent to search his premises.[3] Brown, slip op. at 21. We further asked the trial court to address whether, in light of the Supreme Court's decisions in State v. Carty, 170 N.J. 632, 635 (2002), and State v. Domicz, 188 N.J. 285 (2006), the police required a reasonable and articulable suspicion of criminal activity in order to seek at the roadside defendant's consent to search his home. Brown, slip op. at 21.

On remand, the court denied defendant's suppression motion a second time. The court ruled that the police officers did not require a reasonable and articulable suspicion to ask defendant at the roadside for consent to search his

---

[3] As we will describe in more depth, five of the King factors, which we shall denote as the "coercion" factors, weigh in favor of a finding of involuntariness, whereas three of the factors, which we shall call the "offsetting" factors weigh in favor of voluntary consent. See King, 44 N.J. at 352-53.

home. Even so, the court found that the officers nonetheless did have the requisite level of suspicion. The court also analyzed the unresolved coercion and offsetting King factors, and, after discussing those factors, concluded that defendant's consent to search his home and the safe was voluntary.

For the reasons that follow, we reverse the trial court's application of the King factors and conclude that the items in defendant's house were seized without his valid consent. Consequently, we vacate defendant's conviction that was based on the improperly seized evidence admitted at trial, and remand for further proceedings.[4]

In light of our disposition, we need not resolve whether the State Constitution required the police to have reasonable suspicion of criminal activity at defendant's house in order to ask at the roadside for his consent to search those premises. That open legal question, which is not squarely addressed in Carty or Domicz, is best resolved with the authoritative guidance of the Supreme Court.

---

[4] We do not vacate count six of defendant's conviction for knowingly or purposely possessing a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), as this count relates only to the heroin lawfully seized from defendant's person by the police at the roadside.

I.

For the benefit of the reader, we repeat the pertinent facts as they relate to the search and seizure issues before us. We note in this regard that neither party offered any additional proofs at the remand hearing. Hence, the trial court conducted its analysis based on the existing record and its recollections of the case.[5]

The Lawful Motor Vehicle Stop

At about 8:00 p.m. on April 30, 2015, Jersey City police officers Dennis DeJesus and Gabe Moreano observed a white Ford Taurus fail to stop at a stop sign. The officers pulled over the Taurus. Defendant, the Taurus driver, lowered the windows. A female, later identified as defendant's aunt, was next to him in the passenger's seat.

Officer DeJesus approached the car on the passenger side and Officer Moreano approached on the driver's side. Defendant rolled down his window and Moreano asked him to produce his documentation.

---

[5] The same judge who had presided over the suppression hearing concerning the evidence seized without a warrant also conducted the remand. A different judge presided over the trial, and also conducted a Miranda hearing about the admissibility of defendant's incriminating statements. Miranda v. Arizona, 384 U.S. 436 (1966).

According to the officers' testimony, once defendant rolled down the windows, they immediately smelled the odor of raw marijuana emanating from the car. Moreano asked defendant about the smell of marijuana. Defendant admitted to Moreano he had smoked marijuana earlier that day.

Moreano then asked defendant to step out of the vehicle. As defendant began to do so, Moreano asked him, "if he ha[d] anything on him . . . that could poke me, stab me, anything that could cause me harm." According to Moreano, defendant replied, "Yeah, I have two bundles on me." Moreano's partner, Officer DeJesus, testified that, based on his training and experience, he understood this comment to mean defendant had two bundles of heroin on his person. Defendant told Moreano the heroin was in his right-side back pocket.

The Lawful Pat-Down, Seizure of Drugs on Defendant's Person, and Arrest

Officer Moreano retrieved the two bundles from defendant's pants pocket. Each bundle contained ten small bags of heroin. The police then placed defendant under arrest, handcuffed him, and read him a Miranda warning. The officers searched defendant's person incident to his arrest and seized his keys. The officers also searched the aunt, but found no contraband.

The Car Search

The officers then asked defendant if he would be willing to consent to a search of his car. Defendant denied there was any contraband in the car, but nevertheless agreed to the car search. Defendant signed a consent form, reflecting his agreement to the car search. The police then searched the car and recovered a clear plastic bag of marijuana from the center console.

The aunt called her brother (defendant's uncle), who lived about ten blocks away. The uncle arrived and sought to drive the Taurus away so it would not be towed. However, the officers would not release the vehicle to him. Meanwhile, a police sergeant arrived at the scene.

The Roadside Request for Consent to Search Defendant's Residence

After witnessing defendant sign the form consenting to the search of the car, the sergeant asked defendant if he had any more narcotics at his residence. Defendant said no.

The sergeant then asked defendant at the roadside if he would consent to a search of his residence. According to the police testimony, defendant orally consented.

The Sequential Home Searches

The police drove defendant, who was still in handcuffs, in a patrol car to his residence on Armstrong Avenue where he resided with his uncle and cousin. The police separately drove the Taurus back to the home as well. In the meantime, defendant's uncle returned to the residence and met the officers at the door. The uncle opened the door.[6]

The officers escorted defendant into the residence, and they went into the kitchen. Defendant's uncle was present in the apartment for the entirety of the search.

The officers briefly removed defendant's handcuffs and, at 8:47 p.m., he signed a consent form. The word "room" was handwritten by defendant in parentheses next to his signature.

The Search of the First Room

Once the initial consent form for the room search was signed, officers used a key that was on defendant's key ring to unlock what defendant had initially identified as his bedroom. The officers had difficulty unlocking the door. Concerned that they would break the key or the lock, the officers had defendant

---

[6] Defendant has not contested the uncle's authority to let the officers inside the shared residence.

unlock the bedroom door. The officers removed one of defendant's handcuffs, and he opened the lock. The officers then searched the room in defendant's presence.

Once inside the room, the officers noticed a mattress on the floor, clothes strewn about, and stacks of storage bins. After searching this room, the officers seized numerous items of drug paraphernalia, including empty vials and empty bags. The police did not find any drugs in that room.

The Search of the Second Room

The police then asked defendant if that was truly his room, or whether there were other rooms he used. Defendant replied that he did not use any other rooms. Officers then asked the uncle if there were any other rooms defendant used. The uncle pointed to another room and advised it was defendant's bedroom as well. The police asked defendant if this second room was also his, and he acknowledged that it was.

The police once again temporarily removed defendant's handcuffs. They handed him the key ring, and defendant unlocked the second bedroom. The officers searched the bedroom and found more drug paraphernalia, including a plate with a razor that had drug residue, empty vials, and empty bags. Again, no drugs were found.

## The Search of the Safe in the Third Room

After the police had discovered a considerable amount [of] drug paraphernalia, an officer asked defendant, "[w]here's the narcotics?" Defendant replied that there were no drugs in the house.

Meanwhile, Officer DeJesus spoke separately with the uncle, who orally agreed to let the police search a third bedroom. Inside that third bedroom the police discovered a black safe. The officers questioned defendant and the uncle about the contents of the safe. The uncle said he had not known that a safe was in that bedroom, and he denied owning it. The officers then asked defendant if he owned the safe. Initially, he denied owning it, but eventually conceded the safe was his.

Officer DeJesus asked defendant what was in the safe. According to DeJesus, defendant replied, "[w]hatever you find in there . . . then that's really it . . . there's no gun, nothing else in the house." At about 9:40 p.m., defendant signed another consent-to-search form, this one authorizing the search of the safe. The police opened the safe and found 1,050 bags of heroin, divided into twenty-one bricks. The heroin in the safe had the same logo as the heroin found earlier in defendant's pocket.

A-4938-18T1

The Indictment

Based on this evidence, a Hudson County grand jury charged defendant with multiple crimes. The charges included first-degree operation of a facility for manufacturing heroin, N.J.S.A. 2C:35-4 (count one); second-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2) (count two); third-degree possession of heroin with intent to distribute while within 1,000 feet of school property, N.J.S.A. 2C:35-7 (count three); second-degree possession of heroin with intent to distribute while within 500 feet of a public park, N.J.S.A. 2C:35-7.1 (count four); third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1) (counts five and six); and fourth-degree possession of drug paraphernalia with intent to distribute, N.J.S.A. 2C:36-3 (count seven).

The Suppression Hearing

Prior to trial, defendant moved to suppress the physical evidence, including the drugs and paraphernalia, which the police had seized from his residence without a warrant. After a two-day hearing, the motion judge denied that application, issuing a detailed written opinion. In essence, the judge concluded that defendant had voluntarily provided his consent, both orally and

in written form, to search the two rooms and the safe. The case was then taken over by a second judge ("the trial judge").

### The Trial and Verdict

The case was tried over the course of several days in September 2016. The State presented testimony from several police officers who had been involved in the arrest and search, a forensic chemist who tested the drugs, and a narcotics expert.

Defendant did not testify in his own behalf, but he presented testimony from his aunt who had been the passenger in the Taurus. The defense's theme at trial suggested that someone else other than defendant owned the drugs and paraphernalia found within the residence.

On the second day of their deliberations, the jurors found defendant not guilty of the first-degree manufacturing charge, but guilty of the remaining counts in the indictment.

### Sentencing

The trial judge imposed an eighteen-year custodial term with a nine-year parole disqualifier on count four, and a concurrent five-year term on count six. All other convictions merged.

A-4938-18T1

The First Appeal

Defendant appealed, among other things, the denial of his motion to suppress. His arguments, which we need not repeat here, included other pretrial and trial issues, as well as a challenge to his sentence. Brown, slip op. at 11.

In an unpublished portion of this court's opinion, we remanded the case to the trial court to decide the limited issue of whether defendant had consented to each successive search of the rooms and safe in his home. Id. at 20. We instructed the trial court to "perform a complete factor-by-factor King[7] analysis" Ibid.

To assist the court on remand, we "note[d] that several (but not all) of the factors in the King analysis are clearly present or absent." Id. at 21. As to the five involuntariness factors, the State conceded that King factor one (defendant was "under arrest when his consent was sought") was established. The State also conceded the presence of factor four ("consent was give[n] where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered."). Ibid.

---

[7] King, 44 N.J. at 352-53. The trial court's original written opinion after the suppression hearing recited the King factors, but did not apply them individually to the facts of this case.

A-4938-18T1

We also held that <u>King</u> coercion factor five ("consent was given while the defendant was in handcuffs") was "patently clear," noting, "[t]he mere fact the officers temporarily removed the handcuffs several times from defendant to enable him to turn a key or to sign a consent form does not matter." <u>Id.</u> at 21-22.

Our previous opinion also preliminarily addressed the offsetting <u>King</u> factors. We held that offsetting factor two ("defendant admitted his guilt before consent") was not established. <u>Ibid.</u>

We left the remaining coercion and offsetting <u>King</u> factors to "the motion judge's careful reassessment." <u>Id.</u> at 22.

Finally, we requested the motion judge to reexamine "whether the police had the right at the scene of the motor vehicle stop—after arresting and handcuffing defendant—to ask him to consent to a search of his residence located several blocks away." <u>Ibid.</u> We asked this reexamination to proceed in light of pertinent case law, including the Supreme Court's opinions in <u>Carty</u>, 170 N.J. at 635 (invalidating certain suspicionless car searches in motor vehicle stops), and <u>Domicz</u>, 188 N.J. at 285 (distinguishing the context of consent to search a home provided by a defendant at the residence from consent to search a motor vehicle at the roadside). <u>Ibid.</u> We further instructed the trial court to

reexamine its finding that the residence was known to police as being within an area of drug activity, and reconsider whether that information "justified the police in requesting defendant's consent and in transporting him in handcuffs there." Id. at 22-23.

The Court's Opinion on Remand

In its fifteen-page written opinion on remand, the trial court once again upheld the warrantless search of defendant's premises, and the validity of defendant's consent.

First, the court concluded that, although it was not constitutionally required, the officers had a sufficient reasonable and articulable suspicion to request consent from defendant to search his home. The court reasoned, "[g]iven the sizable quantity of heroin found on defendant's person, the bag of marijuana recovered from his car, the officers' knowledge of the drug trafficking area encompassing defendant's residence, and defendant's recent familiarity with his Miranda and consent-to-search rights," the officers "had a sufficient lawful basis while at the motor vehicle stop to seek defendant's consent to search his home."

The trial court observed that the facts of this case do not present the same "problems caused by standardless requests for consent to search" that were contemplated by the Court in Carty, 170 N.J. at 644. First, the judge found

16                                                                                    A-4938-18T1

defendant's motor vehicle stop was no longer a "minor traffic infraction" based on the seizure of the CDS, it escalated into an indictable investigation. Although "defendant was not physically in his home like [the defendant in] <u>Domicz</u> when he consented to a search of his residence," defendant had already been Mirandized and arrested by the time his consent was requested. Thus, although defendant lacked the "secur[ity] in his own home" to reject the officer's consent request, he had nonetheless already been fully apprised as to both his <u>Miranda</u> and consent-to-search rights. Consequently, the judge found "defendant was fully capable of providing a voluntary consent."

Application of the King Factors

The trial court next addressed the <u>King</u> factors, and concluded that defendant's consent to search his home and the safe was voluntary. The court performed a room-by-room analysis, including the search of the contents of the safe.

With respect to rooms one and two, the court found <u>King</u> coercion factor three (the consent was obtained only after the accused had refused initial requests for consent to search), and mitigating factor one (the consent was given where the accused had reason to believe the police would find no contraband), did not weigh in favor of coercion.

The court noted that, as to both rooms one and two, defendant did not reject the officers' request to search either room. Furthermore, "[t]here was nothing placed on the record as to where, specifically, the contraband was seized. It is thus inconclusive whether defendant had reason to believe that the officers would not find contraband."

The court found King offsetting factor three (defendant affirmatively assisted the police officers), was present because "defendant identified his room, identified the key that unlocked the door, and physically unlocked the door."

As to defendant's consent to search the safe, the court found defendant questioning the officer as to what would happen if he refused to consent to the officer's search, "did not constitute an initial refusal to sign the form[.] He merely sought clarification as to what would transpire if he exercised that right."

The court found permissible the officer's response to defendant that, should he decline to consent to the search, a warrant would be sought. According to the court, the officer's response did not constitute coercion, but was rather "a fair prediction of events that would follow."

Further, the court ruled that offsetting King factor one as to the safe did not favor coercion. The court acknowledged that a safe is a confined space. Therefore, defendant had reason to believe that the officers would find

18

contraband once he consented to a search of the safe. The court further noted that defendant had assisted the officers with their search by conceding ownership of the safe and identifying the key that unlocked it. Thus, "[offsetting] King factor three weighs in favor of voluntariness."

The "Totality" Finding

After completing this factor-by-factor discussion of the King factors, the trial court concluded that the "totality of the circumstances indicate[d] that the search of the safe was voluntary." Defendant had consented to four searches in a period of less than two hours: his car, the first room, the second room, and the safe. "Prior to each search, defendant was apprised as to his rights in a consent-to-search [scenario]. Thus, by the time the officers sought defendant's consent to search the safe, defendant possessed a strong familiarity with his consent-to-search rights."

The trial court accordingly held that the State had satisfied its burden that defendant's consent to search the safe was voluntary, and once again denied defendant's motion to suppress.

This renewed appeal by defendant followed.

## II.

Defendant raises the following points in his brief[8] on the current appeal:

POINT I

FOLLOWING AN APPELLATE REMAND, THE LAW DIVISION ERRED BY AGAIN DENYING BROWN'S MOTION TO SUPPRESS. THE OFFICERS' WARRANTLESS EXPANSION OF A ROADSIDE VEHICLE STOP INTO THE ARRESTEE'S HOME WAS A FISHING EXPEDITION THAT VIOLATED THE ARRESTEE'S CONSTITUTIONAL RIGHT TO BE SECURE IN HIS HOME AGAINST UNREASONABLE SEARCHES. U.S. CONST., AMENDS. IV, XIV; N.J. CONST., ART. I, PAR. 7.

> A. Officers at the roadside stop lacked a reasonable and articulable basis for asking [defendant] to authorize a search of his home.
>
> B. [Defendant's] so-called consent to search his home was involuntary.
>
> C. The Law Division erred by conflating voluntary consent with an arrestee not forcefully objecting to police.

In evaluating a trial judge's ruling on a suppression motion, we afford considerable deference to the judge's role as a fact-finder. Our review of the judge's factual findings is "exceedingly narrow." State v. Locurto, 157 N.J. 463,

---

[8] At the State's request, we also allowed and considered post-argument supplemental briefs.

470 (1999).  We must defer to those factual findings "so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015) (internal citations omitted).  As part of that deference, we particularly must respect the trial judge's assessments of credibility, given the judge's ability to have made "observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." Locurto, 157 N.J. at 474 (internal citations omitted).

However, we owe no deference to the trial judge's conclusions of law. See State v. Hinton, 216 N.J. 211, 228 (2013) (internal citations omitted).  Nor are we "obliged to defer to clearly mistaken findings . . . that are not supported by sufficient credible evidence in the record." State v. Gibson, 218 N.J. 277, 294 (2014).

## A.

We begin our discussion of the consent-to-search issues by repeating passages from our previous unpublished opinion.

The United States Constitution and the New Jersey Constitution both guarantee the right of persons to be free from unreasonable searches and seizure in their home. U.S. Const. amend. IV; N.J. Const. art. 1 ¶ 7.  Warrantless searches are presumptively unreasonable unless, among other exceptions,

21

voluntary consent to the search, without coercion or duress, is provided. Domicz, 188 N.J. at 308; see also State v. Bryant, 227 N.J. 60, 69 (2016).

The State has the burden of demonstrating that the consent-to-search exception applies. State v. Legette, 227 N.J. 460, 472 (2017). Moreover, "[t]he State's burden is particularly heavy when the search is conducted after warrantless entry into a home." Ibid. (recognizing that the home "bears special status"). See also Bryant, 227 N.J. at 69 ("Indeed, 'we accord the highest degree of protection to privacy interests within the home' . . . because 'the sanctity of one's home is among our most cherished rights.'") (first quoting State v. Johnson, 193 N.J. 528, 532 (2008); and then State v. Frankel, 179 N.J. 586, 611 (2004)).

Our Supreme Court has held that in order for a search "[t]o be voluntary, the consent must be unequivocal and specific and freely and intelligently given." King, 44 N.J. at 352 (internal quotations omitted).

An "essential element" of such consent is the individual's "knowledge of the right to refuse [it]." State v. Johnson, 68 N.J. 349, 353-54 (1975). Whether spoken or written, such "assent . . . is meaningless unless the consenting party understood his or her right to refuse" to give it. State v. Suazo, 133 N.J. 315, 323 (1993) (citing Johnson, 68 N.J. at 353-54). Consent is generally a factual

question determined by an assessment of the totality of the circumstances. <u>State v. Koedatich</u>, 112 N.J. 225, 264 (1988).  However, trial courts must adhere to established legal principles in evaluating those circumstances.

B.

As a preliminary matter, we briefly identify—but do not resolve—the constitutional question of whether the police, after finding drugs in defendant's car and on his person, needed to have a reasonable and articulable suspicion that there would be evidence of criminal activity at his house in order to request at the roadside his consent to search his house.  To date, there is no published opinion in our State that expressly answers that question of law.

Certain aspects of the analysis are undisputed.  Defendant concedes that the police, having smelled burnt marijuana during a lawful traffic stop, had a constitutional basis to search his person for drugs.  He also does not contest that the police, having found drugs on his person, had the authority to arrest and handcuff him.  In addition, he does not dispute that, given these facts, the police had a valid basis to request his consent to search his car, which he voluntarily provided.  He challenges the propriety of what occurred thereafter, and, in particular, the validity of the consents he provided to search the house and the safe.

As we indicated in our previous opinion remanding the disputed consent issues to the trial court, a series of Supreme Court opinions sheds some light on the analysis.

First, in 2002 the Supreme Court in Carty, 170 N.J. at 635, held that "in order for a consent to search a motor vehicle and its occupants to be [constitutionally] valid, law enforcement personnel must have a reasonable and articulable suspicion of criminal wrongdoing prior to seeking consent to search a lawfully stopped motor vehicle."  This "reasonable and articulable suspicion standard" is derived from Article I, Paragraph 7 of the New Jersey Constitution, and serves the "prophylactic purpose of preventing the police from turning routine traffic stops into a fishing expedition for criminal activity unrelated to the lawful stop." Ibid.

The Court in Carty reasoned that because a motorist cannot leave the area before a search is completed, the detention associated with roadside searches is unlike a "mere field interrogation" where an officer may question an individual "without grounds for suspicion." Id. at 640 (quoting State v. Maryland, 167 N.J. 471, 483 (2001)).  Roadside consent searches are "instead more akin to an investigatory stop that does involve a detention." Ibid.  Such a stop "traditionally

has required reasonable and articulable suspicion." Ibid. (citing Maryland, 167 N.J. at 487).

The Court likewise was concerned about standardless requests to search, as well as officers "purely discretionary" decisions to search, leading to unjust outcomes and racial profiling. Id. at 641-42. Further, in the context of a motor vehicle stop, where an individual is at the side of the road and confronted by an officer seeking to search his or her vehicle, it is likely that the individual will feel "compelled" to consent to the search. Id. at 644.

The Court stressed in Carty that it was concerned about motor vehicle stops for traffic violations being unduly prolonged by police officers through consensual searches that amount to "fishing expeditions" in the absence of any particularized suspicion that the stopped motorist had engaged in any criminal activity. Id. at 647. The Court declared that "unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional." Ibid. (emphasis added). By adopting the prophylactic requirement of suspicion, the Court largely spared motorists the dilemma of choosing between giving consent to search the vehicle

and possibly only receiving a warning for the traffic violation, or refusing such consent and being issued a summons.

Four years later in State v. Birkenmeier, 185 N.J. 552, 564 (2006), decided eight months before Domicz, the Court identified—but did not resolve—whether Carty's requirement of suspicion extends to a roadside request to search a motorist's home. In Birkenmeier, the defendant was pulled over in his vehicle and asked for consent by the police officer to search his home after the officer found marijuana in the defendant's car and arrested him. Id. at 557. The defendant argued the search of his home was unlawful because the request for consent to search was not preceded by probable cause. Id. at 563-64

At the outset, the Court made clear in Birkenmeier that the defendant's premise (that the officer's required probable cause before seeking consent to search) was incorrect. Ibid. Instead, the Court noted the less rigorous standard, as articulated in Carty, is whether an officer has a "reasonable and articulable suspicion." Ibid.

Analyzing the facts in Birkenmeier, the Court concluded that the police officer not only met the applicable standard under Carty, but also did, based on the facts of that case, have probable cause to seek the defendant's consent to search his home. Ibid. The police were given information by a confidential

informant who had previously provided information that led to major drug seizures. Id. at 555. The informant also gave information regarding the time the defendant would be leaving his home to make a marijuana delivery, provided a physical description of the defendant, as well as the tote bag the defendant would be carrying drugs in, and the make and model of the defendant's car. Ibid.

In a footnote in Birkenmeier highly pertinent to the present scenario, the Court stated that "[f]or purposes of this analysis, we assume, explicitly without deciding, that the requirements of State v. Carty apply to a request for consent to search something other than a motor vehicle addressed to a party in custody." Id. at 564 n. 3 (emphasis added). The Court's assumption is significant here, because defendant was likewise placed in custody at the roadside for a drug offense, and the police asked him to search "something other than [his] motor vehicle."

A few months later in 2006, the Court addressed in Domicz, 188 N.J. at 285, a consent search in the context of a non-roadside setting of a defendant's home, where the police asked for his consent to search the premises. A narrow four-member majority of the justices held that Carty's requirement of suspicion does not extend to such doorstep requests for consent. Three justices opined that they would impose that requirement in the home setting as well.

Factually in Domicz, police officers requested consent to search the defendant's home after knocking on his door outside of the home. The Court majority distinguished these facts from Carty, because Carty "dealt with a problem peculiar to automobiles and disproportionately affecting minority drivers—the indiscriminate abuse of consent searches of cars whose operators had been stopped for minor traffic infractions." Id. at 305-06.

The majority in Domicz further reasoned that "there is a greater degree of compulsion to accede to a consent search when a motorist is stranded on a highway after a motor vehicle stop for a minor traffic infraction and the detaining police offer requests permission to search" than when "a person is secure in his own home and not under any form of detention and a similar request is made." Id. at 306.

The Domicz majority reasoned that the inherent coercive predicament of a driver who is stopped on the highway and faced with the perceived choice of either refusing consent to search, and therefore increasing the likelihood of a traffic ticket as opposed to a warning, is not present when an officer requests consent to search an individual's home. Ibid. The Court stated, "[t]he choices are not so stark for the person who, in the familiar surroundings of his home, can send the police away without fear of immediate repercussions." Ibid.

28                                                        A-4938-18T1

The three justices who dissented in part in Domicz expressed concerns that our case law has long recognized "greater protections against unreasonable searches and seizures of homes than for other encounters." Id. at 318. The dissenters stated that "[i]t naturally follows that whatever protections apply to an automobile search, at a minimum, they must apply to a home." Id. at 319. Hence, the dissenters would have extended the suspicion requirement of Carty to a police officer's request at a house to ask the occupant for consent to enter and search it. They favored a remand to the trial court for a hearing to determine if such suspicion existed. Id. at 320.

In the ensuing fourteen years, no published opinion has resolved what was assumed but not decided in Birkenmeier: Do the police need reasonable and articulable suspicion in order to be constitutionally permitted to ask a defendant at the roadside if he will consent to a search of his home? The trial court on remand in this case answered that question in the negative.

The State and defendant have presented us with strong competing reasons about whether to apply the Carty suspicion requirement to the present roadside setting. Among other points, defendant urges that requiring such suspicion will deter coercive police practices that would otherwise take undue advantage of motorists who are isolated at the side of a roadway. The defense suggests,

although it has no data on the subject, that a failure to extend <u>Carty</u> will result in race-based roadside police requests to ask minority drivers for consent to search their homes.[9] The State, meanwhile, stresses that once, as here, a motorist has been arrested at roadside for a criminal offense, his expectations of privacy and freedom are comparatively diminished and the police should not have to prove suspicion in order to ask for his consent to a search of his residence.

As an intermediate appellate court, we are loath to resolve this important question of constitutional law when, as it turns out because of our <u>King</u> factor analysis, infra, it is unnecessary to reach the issue. <u>See</u> <u>Comm. to Recall Robert Menendez for the Office of U.S. Senator v. Wells</u>, 204 N.J. 79, 95 (2010) (stating that courts "strive to avoid reaching constitutional questions unless required to do so"); <u>Randolph Twp. Ctr., L.P. v. Cty. of Morris</u>, 186 N.J. 78, 80 (2006) (courts "should not reach a constitutional question unless its resolution is imperative to the disposition of litigation."). We therefore pass over this issue

---

[9] The Attorney General's report to the Department of Justice cited by defendant in its supplemental brief does not address the home-search issues presented in this case, but instead focuses on roadside requests for consent to search motor vehicles.

and defer it to a future case where it is vital to the legal analysis.[10]  In the meantime, perhaps the Court will have occasion to speak to the issue, and clarify the import of its own line of precedents from Carty through Domicz.

C.

We turn to what proves to be the dispositive basis for our decision: the application of the King factors.

In its seminal opinion in King, the Court articulated several factors to guide courts in our State as to whether a person's supposed consent for police to search a dwelling without a warrant is voluntary.  As the Court stated, these following five "King factors" weigh against voluntariness, and tend to show that a person's consent was coerced:

> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; and (5) that consent was given while the defendant was handcuffed.
>
> [Id. at 352-53 (internal citations omitted).]

---

[10]  We also have no need to address the trial court's finding in dicta that reasonable and articulable suspicion was present here, except to comment that the finding of drugs in a motorist's car and on his person might not be per se indicative that the motorist keeps illegal drugs at his residence.

A-4938-18T1

Additionally, the Court in <u>King</u> delineated three offsetting factors that can weigh in favor of a finding of voluntariness. Those offsetting factors are whether: "(1) consent was given where the accused had reason to believe that the police would find no contraband; (2) defendant admitted his guilt before consent; (3) defendant affirmatively assisted the police officers." <u>Id.</u> at 353 (internal citations omitted).

The Court in <u>King</u> explained that the "existence or absence of one or more of the above factors is not determinative of the [voluntariness] issue." <u>Ibid.</u> Because the factors "are only guideposts to aid a trial judge in arriving at his conclusion," a trial judge should determine the issue of voluntary consent by considering "the totality of the particular circumstances of the case before him." <u>Ibid.</u>

More recently, in <u>State v. Hagans</u>, 233 N.J. 30, 42 (2018), the Supreme Court reaffirmed the continued applicability of the <u>King</u> voluntariness factors. As the Court reiterated in <u>Hagans</u>, the <u>King</u> factors should not be applied mechanically, and that, ultimately, the totality of circumstances dictate the outcome. <u>Id.</u> at 42-43.

This court has already determined several of the <u>King</u> coercion factors and offsetting factors in defendant's previous appeal. <u>Brown</u>, slip op. at 21. The

State in the previous appeal conceded that <u>King</u> factor one (defendant was "under arrest when his consent was sought") was established. <u>Ibid.</u> The State also previously conceded the presence of coercion factor four ("consent was given[n] where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered."). <u>Ibid.</u>

This court also concluded that <u>King</u> coercion factor five ("consent was given while the defendant was in handcuffs") was "patently clear," noting, "[t]he mere fact the officers temporarily removed the handcuffs several times from defendant to enable him to turn a key or to sign a consent form does not matter." <u>Id.</u> at 21-22.

We also examined the offsetting <u>King</u> factors, and held that offsetting factor two ("defendant admitted his guilt before consent") was not established. <u>Ibid.</u> We left the remaining coercion and offsetting <u>King</u> factors to "the motion judge's careful reassessment." <u>Ibid.</u>

The remaining <u>King</u> factors to analyze are: coercion factor two ("that consent was obtained despite a denial of guilt"); and coercion factor three ("that consent was obtained only after the accused had refused initial requests for consent to search."). Likewise, we must determine whether offsetting <u>King</u> factor one ("consent was given where the accused had reason to believe that the

police would find no contraband"); and offsetting factor three ("defendant affirmatively assisted the police officers"), are present here as to the initial consent.

A. Consent to Search the Home

1. Offsetting King Factor One

The trial court found offsetting King factor one ("consent was given where the accused had reason to believe that the police would find no contraband"), was not established as to the search of the home. The judge reasoned that "[t]here was nothing placed on the record as to where, specifically, the contraband was seized. It is thus inconclusive whether defendant had reason to believe that the officers would not find contraband."

With all due respect to the trial court's ruling of inconclusiveness, the record indicates otherwise. According to Officer DeJesus's testimony, after searching rooms one and two, "[the officers'] main focus was just so much paraphernalia that was in the house, we just—it was like where was the solid narcotics." After searching rooms one and two, and finding a considerable amount of drug paraphernalia and "a lot of empty bags," DeJesus asked defendant, "[w]here's the narcotics?" Defendant replied that there were no drugs in the house. Yet 1,050 bags of heroin were found inside the safe.

A-4938-18T1

While it is theoretically possible that defendant did not expect the officers to find drugs inside the home, this premise is highly unlikely, considering the amount of paraphernalia, empty bags, and residue the officers found in the first two rooms. The record most logically reflects that offsetting King factor one is not present as to the search of the house. Defendant most likely would have expected the police to find contraband once they entered those rooms.

### 2. Offsetting King Factor Three

The trial court found offsetting King factor three present because defendant affirmatively assisted the police officers by identifying the key to the first two rooms and unlocking those rooms. Again, the record does not appear to reasonably support that conclusion.

Officer DeJesus testified that defendant's keys were confiscated at the scene of the traffic stop. He also testified that another officer was in possession of defendant's keys "the entire time the search took place." Further, "[defendant] was handcuffed the whole time he was in the apartment [b]esides the times [the officers] took the handcuffs off so he could open the doors and stuff."

We agree with defendant's argument that he "had no more de facto control over the seized keys than he had over his cuffed hands." The fact that the

officers briefly uncuffed defendant in order to have him open doors with keys that were in the officers' possession does not show that defendant was actively—and volitionally—assisting the officers. The record shows that the only reason the officers asked defendant to unlock the door himself was because they feared breaking it. Offsetting King factor three does not support defendant's voluntariness as to his consent to search the house.

### 3. King Coercion Factor Two

The record objectively shows that King coercion factor two (that consent was obtained despite a denial of guilt) is present here.

In defendant's first appeal, we found offsetting King factor two (defendant admitted his guilt before consent), was not present. Brown, slip op. at 21-22. Despite defendant's contention to the contrary, these factors are not mutually exclusive with one another. For instance, a defendant could remain silent, thereby not admitting to guilt before giving his consent, yet not expressly deny his guilt.

Nevertheless, the record manifestly indicates that King coercion factor two is indeed present. When asked by the officers at the roadside stop if they would find drugs at his house, defendant said no. This is in sharp contrast to his ready willingness to reveal to the officers that he was carrying heroin in his

pocket. Once at his home, defendant continued to deny that the officers would find any drugs.

### 4. King Coercion Factor Three

The trial court on remand found that King coercion factor three was not present because defendant never refused consent to search his home. The officers sought defendant's consent to search his home at the vehicle stop and defendant orally consented. Once at his home, defendant was advised of his right to refuse consent and nonetheless signed the form. The officers did not ask defendant more than once. Further, the trial court reasoned that by identifying a key and unlocking the doors to the rooms, defendant "manifested his continued consent to search."

Defendant argues that he refused the officers' initial request to search by limiting his consent to the first room in the house, as evident by him writing the word "room" on the consent-to-search form. According to defendant, this handwritten limitation manifested his denial of the officer's request to search other parts of the home.

We do not adopt defendant's interpretation of his conduct in writing the word "room" on the form. We recognize that once defendant was put in a position by the police where he was arrested at the roadside, handcuffed, driven

A-4938-18T1

back to his home in a police car, and consent forms were put in front of him, he may well have felt coerced to sign the form.  Yet, he was indisputably told of his right to refuse. On balance, we regard this as a close question, and we defer to the trial court's assessment that King coercion factor three was not proven.

    B. Consent to Search the Safe

       1. Offsetting King Factor One

The trial court determined in its written opinion that "defendant had reason to believe that the officers would find contraband once he consented to a search of the safe," because due to the "limited and confined space [inside of a safe]; it is, when opened, incapable of easily concealing its contents." (Emphasis added).  The court therefore concluded that offsetting King factor one was not present here, as to defendant's consent to search the safe.

We accept the court's reasoning and finding about defendant's likely expectation that a search of the safe would reveal incriminating evidence. However, it appears the court misunderstood the implications of this finding and its impact on offsetting factor one. The offsetting factors weigh in favor of voluntariness.  Here, the judge's conclusion that defendant had reason to believe officers would find contraband inside the safe once it was opened, means that

offsetting factor one is not present, and does not weigh in favor of voluntary consent. Instead, it favors defendant's position that his consent was involuntary.

### 2. Offsetting King Factor Three

The trial court found offsetting King factor three present as to the safe, because defendant affirmatively assisted the police officers by identifying the key to the safe. We accept the court's finding but do not give it much weight.

As we have already noted, defendant's keys were confiscated by police from the time of the traffic stop. The police remained in control of the keys throughout the entire encounter. The fact that defendant, while handcuffed, identified which key on the key ring opened the door to the safe does not have much significance. The alternative would be for the officer to try every key on the ring, and inevitably unlock the safe anyway. The "assistance" provided by defendant in stating which key was the proper one was of minimal consequence. And, again, defendant's handcuffed status likely restrained him from being uncooperative or prolonging the search.

### 3. King Coercion Factor Two

The record shows that King coercion factor two is present here as to the safe. After searching the first two rooms and finding nothing but paraphernalia

and empty bags, Officer DeJesus asked defendant "where's the narcotics?" Defendant responded, "I'm telling you there's nothing else in the house."

Although defendant did not explicitly deny that the police would find any drugs "in the safe" as opposed to "in the house," defendant repeatedly denied culpability throughout this long encounter that consumed several hours. His repeated denials shed light on the voluntariness of his consent to open and search the safe as the last step of the process.

### 4. King Coercion Factor Three

The trial court reasonably found that defendant did not initially refuse consent to search the safe in the third room. Defendant did ask one of the officers what would happen if he refused to sign the consent form, and the officer replied "[n]othing [because] you could refuse . . . then we would apply for a search warrant."

The trial court ruled that defendant's question about the consequences of refusal did not constitute an initial refusal to sign the form. Rather, defendant merely sought clarification as to what would transpire if he exercised that right.

We concur with the trial court that the officer's response to defendant, i.e., that defendant could refuse, and then the officers would apply for a search warrant, was a "fair prediction of events that would follow," rather than a

coercive tactic. <u>Hagans</u>, 233 N.J. at 42. Therefore, the officer's response was a fair predictor of the future events that would occur had defendant refused consent, and <u>King</u> coercion factor three is not established for this phase.[11]

<u>Summary</u>

All told, a logical analysis of the <u>King</u> factors in this case tilts heavily in favor of a legal conclusion of involuntariness.

With respect to the search of the house, four of the five <u>King</u> coercion factors are indicative of coercion, whereas none of the offsetting factors are objectively demonstrated.

The factor-by-factor analysis as to the search of the safe leads to the same conclusion, even though coercion factor three arguably does not pertain.

We recognize that, as <u>King</u> itself instructs, and <u>Hagans</u> reiterates, an assessment of voluntariness is not a mechanical counting exercise, and that the ultimate question is whether the "totality of circumstances" is more indicative of voluntariness rather than coercion. <u>Hagans</u>, 233 N.J. at 42; <u>King</u>, 44 N.J. at

---

[11] In <u>Hagans</u>, the officer preemptively told the defendant that a search warrant would be obtained if he refused consent. <u>Ibid.</u> The defendant in that case did not ask the officer what would happen if he refused consent. Therefore, the Court did not resolve whether the defendant's query comprised an initial refusal, or rather simply an informational inquiry.

353. We also are mindful of the trial court's feel for the case and the perspective in having presided over the suppression hearing. Indeed, we are grateful for the court's second look at the proofs and its rather lengthy written decision on remand.

Nevertheless, we conclude that the circumstances as a whole point heavily in the direction of involuntariness. It must be remembered that the police request to search defendant's house was first made at the side of the road after he had already been frisked, found with drugs, arrested, and placed in handcuffs. He was not then in the familiar surroundings of his own dwelling. His realistic ability to refuse consent in such a stressful time, place, and condition was doubtful. Once at the house and presented with the forms, his oral assent to the search had already occurred.

The sequence of events was connected and, as it turned out, produced the signatures that the police believed relieved them of the necessity for obtaining a warrant. Although reasonable and articulable suspicion might not be constitutionally required to set this chain of consent in motion, the record provides strong indicia of implied coercion. A reasonable person in defendant's shoes would likely have similarly yielded.

A-4938-18T1

Lastly, we must not overlook or undervalue the heightened protection that the federal and state constitutions provide in safeguarding privacy within one's own home. See, e.g., Legette, 227 N.J. at 472; Bryant, 227 N.J. at 69. To affirm the warrantless searches in this case, where the King factors so heavily tilt against the State, is not consistent with those home-as-castle principles.

The trial court's denial of the motion to suppress the fruits of the search of defendant's house and the contents of the safe is therefore reversed. We vacate defendant's conviction, and remand for further proceedings. We do not rule out, however, the prosecution's ability to pursue a new trial on some or all of the charges with other evidence.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4938-18T1