**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3048-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RALPH M. LEMAR,

    Defendant-Appellant.

_____

Argued February 6, 2025 – Decided February 18, 2025

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-08-2401.

Andrew R. Burroughs, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Steven M. Gilson, on the brief).

Maura M. Sullivan, Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Maura M. Sullivan, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Ralph Lemar appeals from a May 1, 2023 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

After a jury convicted defendant of first-degree armed robbery, second-degree conspiracy to commit armed robbery, third-degree aggravated assault, third-degree possession of a weapon for an unlawful purpose, fourth-degree unlawful possession of a weapon, and the lesser-included offense of third-degree aggravated assault, the court merged certain of the offenses and denied the State's application for an extended term. The court thereafter sentenced defendant to a seventeen-year aggregate custodial term, subject to an eighty-five percent period of parole ineligibility and five years of parole supervision, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed defendant's convictions and sentence on direct appeal and the Supreme Court denied certification. See State v. Lemar, No. A-3167-16 (App. Div. Apr. 9, 2019), certif. denied, 239 N.J. 506 (2019).

Defendant's convictions stem from an incident in which he attempted to detain Eric Webb on behalf of Marvela S. Brown-Bailey, an alleged licensed

bail bondsman.[1]  We detailed the relevant trial evidence supporting defendant's convictions in our prior opinion, which we incorporate here.  We supplement those relevant facts as necessary to place our opinion in context.

After being confronted by defendant and other individuals, Webb fled in his silver Chevrolet Malibu.  Defendant, Williams, and co-defendant Jovani A. Diaz pursued Webb as he fled.  Diaz testified she was driving a white Chevrolet Impala, which belonged to the mother of one of defendant's children, during what turned into a high-speed pursuit, and which eventually terminated in a wooded area behind a motel in Atco.  Defendant's convictions relate to his actions behind the motel.

Diaz testified at trial that when she stopped her vehicle, Webb was unable to exit his car via the driver's side door because she stopped the Impala alongside Webb's Malibu.  Diaz stated Webb "was trying to get out.  He was coming from the driver's side[,] leaning over to the passenger's side[,] trying to get out [of] the car."

---

[1] Defendant was tried with co-defendants Brian K. Williams, Marvela S. Brown-Bailey, and Innis J. Henderson.  Prior to trial, Jovani A. Diaz entered into a plea agreement with the State in which she agreed to plead guilty to second-degree conspiracy to commit robbery.

Webb testified it was at that point defendant opened the passenger's side door, jumped in, and hit him in the head with a tire iron. Corroborating Webb's testimony, Diaz recanted her earlier statements to the police and testified at trial she witnessed defendant hit Webb "once in the face" with the tire iron. Webb stated he received seven stitches in his forehead as a result of defendant striking him with the tire iron. Further, Webb explained he informed officers at the scene he witnessed defendant throw the tire iron into the woods.

Webb testified another male "jumped on" him from the back and began punching him in the ribs. Webb could not positively identify Williams as the other male, however, Diaz testified she witnessed Williams "punching" Webb. Diaz also testified defendant and Williams were both "beating on" Webb. Webb also testified a woman "attacked [him] from the driver's side," and restrained his legs. Although Webb could not identify the woman, Diaz admitted to holding Webb's legs and "hitting him."

Webb testified defendant took his sunglasses and necklace, and stated, "You don't need this. You goin' to jail." Webb also stated the woman removed money from his pockets after being ordered to do so by defendant. Diaz admitted to taking Webb's cell phone and cash. Webb's cell phone was recovered from Diaz's belongings after her arrest.

4

On the date he testified, Webb was serving two prison terms, one for fourth-degree aggravated assault, and the other for charges stemming from the heroin he was in possession of when the police searched him on the night of the incident. Webb also testified to his prior convictions for burglary, resisting arrest, and drug offenses; admitted he knew he had an arrest warrant out for him for violating his probation, and for failing to appear for a court date while out on bail on firearms charges; and admitted he had not made the required payments to his bail bondsman.

Officers Michael Hackman and Timothy Arthur Lyons of the Waterford Township Police Department both testified they observed blood in the front passenger side area of Webb's car and a tire iron on the front passenger's seat of the Impala. Officer Lyons also testified only Webb appeared injured. The scientific testimony elicited at trial established the clothing worn by defendant and Williams had Webb's blood on it. Although defendant did not testify, the State played a 9-1-1 call he made while attempting to detain Webb in which he stated "if you move again, I'm going to knock" you.

After arriving at the scene, officers handcuffed Diaz and placed her on the ground next to the Impala. Subsequently, officers assisted Diaz off the ground,

A-3048-22

moved her away from the wooded area and closer to the motel, and Mirandized[2] her. After a female officer was called over to conduct a pat-down search of Diaz, officers engaged her in an effort to obtain her written consent to search the Impala. The following colloquy occurred between Diaz and one of the officers:

> Officer: Do you understand what your rights are?
>
> Diaz: Yeah.
>
> Officer: Did you sign off on them yet? Put your hands in front of you. Turn around.[3] It's alright. It's alright. Listen, I don't know who you are or who anybody else is at this point. We're trying to treat everybody the same until we find out what's going on. Fair enough?
>
> Diaz: Yeah.
>
> Officer: Alright. Are you a bounty hunter?
>
> Diaz: No. I'm actually just a friend. A friend of theirs. I was actually on my way. Do you mind if I just pull my hair back?
>
> Officer: Go ahead, go ahead. Do what you gotta do. You're gonna answer our questions?
>
> Diaz: Answer questions? I mean, yeah if it's the same simple questions.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] When the officer said, "turn around," he released Diaz from the handcuffs.

Officer: You said no. Do you wanna answer our questions?

Diaz: Yeah.

Officer: Then just check yes [waiving her Miranda rights.]

Diaz: Ok.

Officer: It's alright. I just need you to sign your name right there.

Diaz: It's not my car.

Officer: Were you driving it?

Diaz: Yeah,

Officer: You were driving it, so that's where we're at . . . . So, you were driving the car?

Diaz: Okay.

Officer: So, do you have any problem with us searching through that car?

Diaz: No.

Officer: Will you sign off on that?

Diaz: I can't sign off because it is not my car. It's his car. It's the bounty hunter's car.

Officer: You were driving?

Diaz: Yeah.

7

Officer: You were driving.

Diaz: Okay.

Officer: So do you want to give us consent?

Diaz: I guess.

Officer: I'm just asking. You can tell me to go pound sand for all I care. And then we'll just do it the other way.

Diaz: I don't care.

Officer: So, will you sign off on giving us consent?

Diaz: Mmhuh.

After receiving verbal consent to search the vehicle, officers reapplied handcuffs on Diaz. Officer Hackman proceeded to read the consent form to Diaz, inform her of her right to refuse consent, and of her right to terminate the search at any time. Diaz then signed the consent form.

Officer Hackman, who participated in the search of the Impala, testified at trial that when he arrived at the scene the doors of the Impala "were open." He also testified when he looked inside the vehicle he saw "a tire iron that was on the front driver's seat," but later clarified the tire iron was actually on the front passenger seat. Officer Hackman further explained when he searched the trunk of the Impala, he saw a tire jack that was associated with the tire iron.

A-3048-22

Officer Lyons also testified he saw the tire iron on the front seat of the Impala when he searched the car.

Detective John Ellis of the Camden County Prosecutor's Office Crime Scene Investigation Unit also testified and conceded on cross-examination, his office did not perform any fingerprinting analysis of any evidence involved in this matter, including the tire iron. Cortney MacDonald, an employee for the State Office of Forensic Sciences, testified she tested for blood on the tire iron, which returned a negative result.

Detective Leonard Thackston of the Waterford Township Police Department testified he took photographs of the tire iron on the front passenger seat that night and removed it from the vehicle the next day.[4] Detective Thackston further explained he did not process the tire iron for any evidence because "it would have contaminated any possible DNA that would [have] be[en] on the tire iron." Specifically, Detective Thackston explained he did not test the tire iron for fingerprints because "once [an item has] been dusted with powder, you can't submit . . . the DNA[] to the state lab." On cross-examination,

---

[4] Defendant did not challenge the chain-of-custody of the tire iron in his direct appeal or before us.

however, Detective Thackston conceded he was not sure if items that are dusted for fingerprints can never be tested for DNA.

Detective James Brining of the Camden County Prosecutor's Office testified and initially conceded it was his understanding both a DNA and fingerprint test can be conducted on the same item of evidence, but later clarified he was "not sure." Detective Brining further explained the tire iron was not tested for fingerprints because his office "wanted to get it to the State Police scientist for them to actually work with the DNA. And with that, when the fingerprints being rolled in . . . powder for fingerprints to try to be lifted, and at that rate we thought it would contaminate the tire iron for DNA." In summation, defendant's trial counsel reminded the jury of the inconsistent testimony elicited from the State's witnesses regarding why the tire iron was not tested for fingerprints. Defendant's counsel also stressed the inconsistencies between Webb's testimony about defendant throwing the tire iron into the woods and its presence in the car. Counsel also impeached Webb and Diaz regarding their prior inconsistent statements about what Webb initially characterized as a "metal object" and Webb's prior convictions.

Defendant filed a timely petition for PCR in which he summarily attested he was deprived of his "Sixth Amendment [c]onstitutional [r]ight to effective

assistance of trial counsel."  In counseled and pro se briefs, he supplemented his petition and argued his trial counsel provided ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 687 (1984), by failing to file a motion to suppress the tire iron.  Specifically, based on the factors set forth in State v. King, 44 N.J. 346 (1965), defendant argued the police did not lawfully obtain consent from Diaz to search the Impala primarily because defendant was "handcuffed at the time" she gave consent.  Second, defendant argued trial counsel was ineffective for failing to retain an expert and challenge the State's assertions why the tire iron was not tested for DNA or fingerprints.

After considering the parties' written submissions and oral arguments, Judge David M. Ragonese denied defendant's application in a May 1, 2023 order and explained his decision in a comprehensive forty-page written opinion.  He rejected defendant's claim trial counsel provided ineffective assistance based on his failure to file a motion to suppress the tire iron pursuant to the well-settled principle that "[t]he failure to raise unsuccessful legal arguments does not constitute ineffective assistance of counsel." (quoting State v. Worlock, 117 N.J. 596, 625 (1990)).  The judge explained the motion "would have been . . . futile" because consent is a valid exception to the warrant requirement, and "the record show[ed] that Diaz gave consent to search the Impala."

Applying the King factors, the judge found Diaz's consent was "knowing and voluntary." Specifically, he found the following circumstances constituted Diaz's "knowing and voluntary" consent: (1) Diaz was not handcuffed when she consented; (2) "Diaz was not under arrest when she provided consent and police did not obtain consent after Diaz denied any guilt"; (3) Diaz did not refuse initial requests to search the vehicle, rather, she believed she did not have authority to consent given she did not own the vehicle; and (4) police officers advised Diaz of her right to refuse consent. Relying on State v. Maristany, 133 N.J. 299, 305 (1993), the judge also concluded "it is clear that Diaz had authority to consent to search the Impala because she was the one who was driving, the police saw her identification in the car, and it was reasonable for police to believe that she possessed common authority over the car."

Additionally, the judge also found the search was valid under the plain view doctrine because: (1) the officers were lawfully present at the scene; (2) the vehicle's doors had been left open by its occupants; (3) the officers could see the tire iron from outside the car; and (4) "the officers had probable cause to associate the tire iron with the assault perpetrated on Webb."

With respect to defendant's contention his trial counsel should have called an expert to testify "that the State's assertion that the tire iron could not be tested

for fingerprints was not credible," the judge found defendant's claims were "belied by the record." First, he noted on cross-examination defendant's trial counsel "elicited from the State's expert witnesses that the State did not request to dust the tire iron for fingerprints." Additionally, the judge referenced trial counsel's summation in which he highlighted the State's failure to test for fingerprints and inconsistent testimony regarding the reasoning why the tire iron was not tested for fingerprints.

Second, defendant failed to establish "that the outcome of the trial would have been different had a defense expert presented in this regard." As the judge explained,

> [t]he jury considered the evidence, heard the arguments of counsel, and was unpersuaded about their impact on . . . defendant's guilt. Even if an expert had been called, the jury still heard the testimony of Webb and Diaz who identified defendant as the person who attacked Webb with it. The jury saw the video from the officers' body-worn cameras that showed the tire iron in the front seat of the Impala. It heard testimony describing Webb's injuries and the video showed him injured as well. The evidence tending to prove that defendant used the tire iron to assault Webb was substantial. Any limited expert testimony to point out inconsistencies in two witnesses would have done little to change the outcome of the trial.

On appeal, defendant's PCR counsel argues:

THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS.

> A. Trial Counsel Failed to Move to Suppress the Tire Iron.

> B. Trial Counsel Failed to Have a Forensic Expert Testify Regarding the Viability of Testing the Tire Iron for Fingerprints and DNA.

In a pro se submission, defendant also argues:

> TRIAL COUNSEL FAILED TO MOVE TO SUPPRESS THE TIRE IRON.

More specifically, PCR counsel contends the judge erred in concluding a motion to suppress the tire iron would have been unsuccessful because the body camera footage in the record "reveals that Diaz was Mirandized and handcuffed prior to her consenting to search the car" and "arrested prior to her consenting," which under the totality of the circumstances, "negate[s]" her consent. Further, defendant contends because police officers "identified and recovered" the tire iron from the Impala only after improperly obtaining Diaz's consent, they had no authorization to be in the vehicle and thus the plain view exception to the warrant requirement was inapplicable. Additionally, in his pro se submission, defendant asserts officers at the scene could not have seen the tire iron through the Impala's windows because they are tinted at "[five percent] over [five

14

percent], therefore prohibiting anyone from seeing through those windows even from a perspective right up against them."

Through PCR counsel, defendant next contends "trial counsel's failure to have a forensic expert testify regarding the viability of testing the tire iron for fingerprints and DNA constituted a prima facie case of ineffectiveness." In support of this argument, defendant relies upon the expert report of Charlotte J. Word, Ph.D., in which she concluded "there is no technical or procedural problem that would preclude conducting both fingerprinting and DNA testing on various items of evidence, including a tire iron, in New Jersey as long as proper procedures and materials free of human DNA are used throughout the testing." Defendant further maintains "expert testimony, such as that of Dr. Word, would have exposed an irretrievable vacuum in the State's case regarding the wielder of the tire iron and clearly transcended the dubious credibility of . . . Webb and . . . Diaz."[5]

---

[5] During oral argument before us, defendant raised arguments neither briefed before the PCR court nor us. Consistent with well-established principles governing appellate practice, as well as basic notions of fundamental fairness, we limit our discussion to those issues properly raised by the parties as they appear in their merits briefing and arguments before the PCR court. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (explaining the "well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is

We reject all of defendant's arguments and affirm substantially for the reasons set forth in Judge Ragonese's thorough and well-reasoned opinion. We provide the following additional comments to amplify our decision.

## II.

Because the judge did not hold an evidentiary hearing, we review both the factual inferences drawn from the record and any legal conclusions de novo. State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020); see also State v. Nash, 212 N.J. 518, 540-41 (2013). We consider the judge's decision to proceed without an evidentiary hearing for an abuse of discretion. State v. Vanness, 474 N.J. Super. 609, 623 (App. Div. 2023) (citing State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013)).

---

available" (quoting State v. Robinson, 200 N.J. 1, 20 (2009))); see also Noye v. Hoffmann-La Roche Inc., 238 N.J. Super. 430, 432 n.2 (App. Div. 1989) (explaining that we need not decide an issue that the party did not brief but raised for the first time during oral argument).

Further, defendant has not reprised all of the six arguments he properly raised before the PCR court. We accordingly do not address those unasserted arguments in our opinion and deem those unbriefed contentions waived. See Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2024) ("[A]n issue not briefed is deemed waived.").

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee that a defendant in a criminal proceeding has the right to the assistance of counsel in his or her defense. The right to counsel includes "the right to the effective assistance of counsel." Nash, 212 N.J. at 541 (quoting Strickland, 466 U.S. at 686).

In Strickland, the Court established a two-part test to determine whether a defendant has been deprived of the effective assistance of counsel. 466 U.S. at 687; see State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland test under our State Constitution). Under the first prong, it must be demonstrated that counsel's handling of the matter "fell below an objective standard of reasonableness," and "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687-88.

When considering a defendant's proofs, however, a court must show "extreme deference" in assessing defense counsel's performance, Fritz, 105 N.J. at 52, and "indulge a strong presumption that [it] falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689. To establish prejudice under the second prong, a defendant must demonstrate a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

"With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving [their] right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012); see also State v. Goodwin, 173 N.J. 583, 593 (2002). A defendant must "do more than make bald assertions that [they were] denied the effective assistance of counsel" to establish a prima facie claim. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). "The failure to raise unsuccessful legal arguments does not constitute ineffective assistance of counsel." Worlock, 117 N.J. at 625. Defendant's failure to satisfy either prong of the Strickland standard requires the denial of a PCR petition. Nash, 212 N.J. at 542; Fritz, 105 N.J. at 52.

"A warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Cooke, 163 N.J. 657, 664 (2000)). "[T]he State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls within one of the . . . exceptions . . . .'" State

v. Elders, 192 N.J. 224, 246 (2007) (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

At issue here are consent and the plain view exceptions. With respect to consent, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, [they] ha[ve] the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). "To be voluntary[,] the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" King, 44 N.J. at 352 (quoting Judd v. United States, 190 F. 2d 649, 651 (D.C. Cir. 1951)). To satisfy that requirement, the State must prove "that the individual giving consent knew that [they] 'had a choice in the matter.'" State v. Hagans, 233 N.J. 30, 39 (2018) (quoting State v. Carty, 170 N.J. 632, 639 (2002), modified on other grounds, 174 N.J. 351 (2002)). Thus, "the consenting party must know that [they have] the right to decline consent." State v. Birkenmeier, 185 N.J. 552, 563-64 (2006) (citing State v. Johnson, 68 N.J. 349, 353-54 (1975)).

"Consent is . . . a factual question to be determined from the relevant circumstances." State v. Koedatich, 112 N.J. 225, 264 (1988). In King, our Supreme Court "delineated factors for use by our courts in considering the

A-3048-22

voluntariness of consent." Hagans, 233 N.J. at 39 (citing King, 44 N.J. at 352-53). Generally,

> [f]actors potentially indicating coerced consent include:
>
> > (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.
>
> Factors potentially indicating voluntariness of consent include:
>
> > (1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted [their] guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers.
>
> [Id. at 39-40 (second and fourth alteration in original) (citation omitted) (quoting King, 44 N.J. at 352-53).]

"[M]any decisions have sustained a finding that consent was voluntarily given even though the consent was obtained under the authority of the badge or after the accused had been arrested." King, 44 N.J. at 353. "Voluntariness depends on 'the totality of the particular circumstances of the case' with each

case 'necessarily depend[ing] upon its own facts.'" Hagans, 233 N.J. at 40 (alteration in original) (quoting King, 44 N.J. at 353).

In Hagans, an officer stopped a car for a motor vehicle violation, and while waiting for the driver to provide her driving documents, smelled burnt marijuana in the vehicle. Id. at 34. The officer handcuffed the driver, Mirandized her, and placed her in the back seat of his police vehicle. Ibid. In seeking the driver's consent to search the vehicle, the officer stated "it would be a lot easier if [the driver] would just make things easy," and read her the consent form. Id. at 34-35. After the officer explained the driver's rights to refuse consent and to withdraw consent at any time, she refused to consent to a voluntary search of her vehicle. Id. at 35. When the officer expressed his intention to "apply for a search warrant, . . . [which would] prolong the inevitable," the driver consented. Ibid. The officer then reread the consent form and the driver confirmed her consent. Ibid.

The Hagans Court found sufficient support for the conclusion that the driver knowingly and voluntarily consented to the vehicle search. Id. at 42. In making this determination, it emphasized that the King factors are not dispositive, as "[t]he objective of a court undertaking a voluntariness analysis is to scrutinize 'the totality of the particular circumstances of the case.'" Id. at 42

A-3048-22

(emphasis omitted) (quoting King, 44 N.J. at 353). Accordingly, "despite the presence of several of the potentially coercive King factors," the totality of the circumstances demonstrated that the driver's consent was voluntary. Id. at 43.

Applying these principles to the record before us, Judge Ragonese correctly found defendant's trial counsel was not ineffective for failing to file a suppression motion regarding the tire iron because such a motion would have been unsuccessful. With respect to Diaz's consent to search the Impala, the judge correctly determined under "the totality of the circumstances, . . . the consent provided by Diaz to search the Impala was knowing and voluntary."

As in Hagans, despite the fact Diaz was previously Mirandized and handcuffed when she signed the consent form, the totality of the circumstances demonstrates her consent was "voluntarily given." See King, 44 N.J. at 352-53 ("[M]any decisions have sustained a finding that consent was voluntarily given even though the consent was obtained under the authority of the badge or after the accused had been arrested.").

First, and for the purpose of clarity, although Diaz was Mirandized and handcuffed prior to providing verbal consent and subsequently re-handcuffed, she was not handcuffed when she verbally consented to the search. Second, she did not refuse initial requests to search the vehicle, rather, she initially believed

22                                                                                         A-3048-22

she did not have authority to consent because she did not own the car. On this point, the officer requesting consent from Diaz informed her she was free to decline and tell him to "pound sand," as he would proceed by attempting to obtain a search warrant. Third, Diaz was repeatedly informed of her right to refuse consent and of her right to revoke it at any time. Lastly, she reasonably appeared to possess common authority over the vehicle because she was the driver, as the court found and to which defendant has not contested in his submissions before us. Maristany, 133 N.J. at 305.

An officer may, without a warrant, "seize evidence or contraband that is in plain view." State v. Gonzales, 227 N.J. 77, 90 (2016). To lawfully seize evidence or contraband under this exception, the "officer must lawfully be in the area where [they] observed and seized the incriminating item or contraband, and it must be immediately apparent that the seized item is evidence of a crime." Id. at 101. Additionally, "the officer has to discover the evidence 'inadvertently,' meaning that [they] did not know in advance where evidence was located nor intend beforehand to seize it." State v. Bruzzese, 94 N.J. 210, 236 (1983) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 470 (1971)), overruled in part by Gonzales, 227 N.J. at 82.

The judge correctly found a suppression application would have been futile because seizure of the tire iron was justified by the plain view exception to the warrant requirement. First, the officers were lawfully at the scene as they were responding to reports of a car crash. Second, despite defendant's contentions regarding the window tinting on his car, the tire iron was in plain view as the doors to the Impala had been left open by its occupants and the tire iron was visible on the front passenger seat. Third, the incriminating nature of the tire iron was immediately apparent given the fact Webb informed the responding officers he had been struck in the head with a "metal object." Lastly, the officers search of the vehicle satisfied the inadvertency requirement because they identified the tire iron in the course of responding to the car crash and rendering treatment to Webb.

The judge also properly determined defendant failed to establish ineffective assistance of counsel based upon trial counsel's failure to retain an expert witness. As the judge noted, defendant's trial counsel elicited from the State's expert witnesses on cross-examination "that the State did not request to dust the tire iron for fingerprints." Additionally, in summation, defendant's trial counsel specifically pointed out to the jury the lack of DNA and fingerprint testing on the tire iron. Further, defendant's trial counsel elicited on cross-

examination conflicting answers from Detectives Thackston and Brining regarding whether or not fingerprint and DNA testing can be conducted on the same piece of evidence, a point defendant's counsel again stressed in summation.

Second, as the judge also cogently observed, defendant also failed to establish Strickland's prejudice prong as there does not exist a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. As to the failure to retain an expert, the jury was, as noted, fully informed about the lack of fingerprint or DNA evidence connecting defendant to the tire iron. Indeed, defendant's counsel forcefully argued before the jury that "[w]e know that there was no blood. We don't know whether there was DNA. We don't know whether there [were] fingerprints. And why is that? Because the State never bothered to check."

Further, as to the lack of an expert and failure to suppress the tire iron, as the judge noted, "the jury still heard the testimony of Webb and Diaz who identified defendant as the person who attacked Webb." Based on the testimony of these witnesses, the jury had substantial proof to convict defendant and reached their determination despite defendant's counsel's impeachment of Webb and Diaz and his challenges to the State's proofs regarding defendant's use of

25

the tire iron and if it was the actual instrument used during the assault. Simply put, nothing in the record suggests counsel's performance was deficient in any way or that defendant was prejudiced by counsel's actions or inactions.

Finally, because defendant did not establish a prima facie case of ineffective assistance of counsel, we likewise conclude the judge did not abuse his discretion in denying defendant's request for an evidentiary hearing. See State v. Preciose, 129 N.J. 451, 462 (1992). To the extent we have not addressed specifically any of defendant's remaining arguments it is because we have concluded that they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION